PEOPLE *v.* JORDAN

1. RAPE—CRIMINAL LAW—EVIDENCE—SUFFICIENCY.

Testimony by complainant that she was raped by defendant, positive results of a medical examination of complainant for sperm, and the fact that defendant possessed a white handkerchief with blue stripes identical to that described by complainant as being used by defendant to wipe semen off her legs, if believed by the jury, is sufficient evidence to support a conviction of the crime of statutory rape.

2. RAPE—CRIMINAL LAW—WITNESSES—CREDIBILITY.

The danger of charges of sexual assault by young girls where the record raises serious questions of whether the defendant is truly guilty is that spite may lead to a fabrication of assault or malicious identification.

3. RAPE—CRIMINAL LAW—SEXUAL OFFENSES.

Courts find reversible error in points which otherwise pass unnoticed, where the record presents an exceptionally difficult question of guilt in the psychologically complicated and emotionally charged context of sexual offense.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–4]  44 Am Jur, Rape § 64 *et seq.*
[5]  42 Am Jur, Prosecuting Attorneys § 20.

4. RAPE — CRIMINAL LAW — EVIDENCE — HANDKERCHIEF — CHEMI-
CAL ANALYSIS.

> Failure by prosecution to have a handkerchief, allegedly used
> by defendant after a statutory rape, chemically analyzed
> to determine whether stains on it contained traces of semen
> resulted in an inadequate foundation to admit the hand-
> kerchief into evidence and caused reversible error where the
> handkerchief had a highly prejudicial effect because it cor-
> roborated the story of the complainant, who was otherwise
> impeached, and where a later analysis did not show traces
> of sperm, the absence of sperm being material in the cir-
> cumstances.

5. CRIMINAL LAW—PROSECUTOR—PUBLIC INTEREST.

> A prosecuting officer represents the public interest, which can
> never be promoted by the conviction of the innocent, and
> consequently must show the whole transaction, as it was,
> whether its tendency be to establish guilt or innocence.

Appeal from Wayne, Geraldine Bledsoe Ford, J. Submitted Division 1 March 14, 1970, at Detroit. (Docket No. 6,964.)  Decided April 27, 1970.

Walter Jordan was convicted of rape.  Defendant appeals.  Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Leonard Meyers,* Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow* (Defenders' Office—Legal Aid and Defender Association of Detroit), for defendant on appeal.

Before: QUINN, P. J., and T. M. BURNS and O'HARA,* JJ.

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

T. M. Burns, J. Defendant Walter Jordan was convicted, following a jury trial, of rape, MCLA § 750.520 (Stat Ann 1954 Rev § 28.788). Defendant brings this appeal as of right.

We have examined the record in great detail and the following appear to be the facts of the case. The complainant, Barnie Bracey, a nine-year-old girl, lived in an apartment with her mother in the city of Detroit in December, 1966. Defendant, his wife and stepdaughter, who is the same age as complainant, lived on the same floor of the building, across the hall from the Bracey apartment.

Complainant testified that on Saturday, December 17, 1966, the defendant called her on the telephone while she was watching the "Tom and Jerry Show" on television.[1] Complainant testified that defendant then knocked on her apartment door and was admitted. She stated that after defendant removed a pencil and paper from her hands, he carried her into the bedroom, where, after she removed her pajamas and he his trousers, the defendant allegedly carnally knew her. She testified that when he finished there was "snot" running down her legs. Defendant allegedly then took out a white handkerchief with blue stripes which he used to wipe the "snot" off her thighs. He then allegedly threatened to "whip" her if she told anyone, and promised to give her some candy if she did not. He left the apartment briefly, returned with some chocolate drops, and left again.

Complainant's testimony was extremely vague at trial regarding the chronology of events. Barnie's mother, who was working elsewhere during the time of the alleged attack, testified, however, that she

---

[1] While the time of the program was not put into evidence at trial, the record on appeal includes an affidavit stating that the "Tom and Jerry Show" was shown on WJBK-TV in Detroit from 1 p.m. to 1:30 p.m. on December 17, 1966, the date of the crime.

received a call from Barnie at approximately 3:45 p.m. and that the girl stated that defendant had attacked her. The investigating officers also testified that when they interviewed the complainant they were told the incident took place around 3:30 p.m. The police were called about 4:45 p.m. and Barnie was taken to the hospital where medical tests for sperm were immediately performed. These tests proved positive.[2] The police returned to the apartment building and arrested defendant at approximately 5:30 p.m. At the time of his arrest, defendant had in his possession a white handkerchief with blue stripes which had certain unidentified stains. No attempt was made to identify the stains prior to trial.

From the moment of his arrest, defendant has consistently and vehemently denied any guilt at every stage of the proceedings. He testified that during the morning of December 17, 1966, he and his wife had gone out to get the car washed and stopped by Kresge's to pick up an organ for his stepdaughter's birthday which was the next day. After returning home at about 11:30 a.m., his wife made lunch. Then he, his wife and stepdaughter went shopping for Christmas presents. He stated they left the apartment at about 12:30 p.m. and did not return until approximately 5 p.m. He denied ever phoning complainant or seeing her that day.

Defendant's testimony was corroborated by his wife, who outlined the day's activities in substantial detail. She testified as to which stores were patronized and what items were purchased. In support of their testimony, defendant's wife produced sales

---

[2] The doctor testified that he found no evidence of "trauma," *i.e.* "bruises, scratches, irritation of any sort." The doctor's analysis, however, "found occasionally one sperm per high power field under the microscope" which indicated to him that intercourse had occurred "any time within the preceding twenty-four hours,".

slips, dated December 17, from the stores in which they had shopped. There was also testimony that defendant's wife was not licensed to drive and that, therefore, defendant of necessity went along with her to drive her to and from the stores. Defendant's stepdaughter also testified, describing the same series of events.

Defendant's alibi was further supported by the custodian of the apartment building. The custodian testified that he spent the entire afternoon, until 4:30 p.m., painting on the third floor of the building in an area which gave him a complete view of the building courtyard and driveway. He stated that it would not have been possible for anyone to either enter or leave the building during this period without being seen by him. He testified that he saw defendant leave the building at approximately 12:30 p.m. with his wife and stepchild, get into his car and drive away. He further testified that he saw defendant, his wife, and stepchild return late in the afternoon after the police had arrived.[3]

The record below includes testimony throwing substantial doubt on complainant's credibility. Defendant's wife, the apartment caretaker, two other tenants and one of complainant's classmates all testified that complainant would often approach strange men and say such things as "If you want to be my daddy, you give me a dime and you can be my daddy." One tenant testified:

"I have brought Barnie off Twelfth Street twice. Once around on Twelfth and Philadelphia with little boys. The only little girl with all those boys, beg-

---

[3] The caretaker testified that upon seeing defendant, his wife and stepdaughter drive up:
"I spoke to my wife. I said, 'Here come Walter and them. I bet they don't know anything about the police was looking for them.' She said, 'Well, I'm going to tell them.' I said, 'It's up to you.' So she goes around and tells them."

ging for dimes. And it is the most vulgar language I have ever heard. I spoke to the mother about it, and the mother didn't seem to believe me. And Barnie told her it wasn't true right to my face.

"And another time I saw her on the east side of the apartment building going toward Twelfth. There is a stairwell there on that side of the apartment. And here was a boy around ten or eleven years old. He was a large boy. He had picked Barnie up and had her dress raised up over her abdomen."

On cross-examination complainant admitted rubbing her body against an exterminator man and asking for pennies and dimes and that he "be her daddy."

There was testimony from her mother and other witnesses that Barnie had had trouble with a teacher and had taken a knife to school to try to kill him. There was also testimony that she would throw temper tantrums upon being corrected. Several witnesses testified that complainant often lied. Further, Barnie's mother said that Barnie had a psychiatric examination after the attack on the teacher. This line of questioning was not pursued, however, to determine what conclusions, if any, were drawn from the examination.

Our review of complainant's testimony indicates that her memory was highly selective. For example, she remembered both her home phone number and the phone number at her mother's employment, although her call after the alleged incident was the only time she had ever called her mother at work. She did not remember, however, the name of her teacher or the fact that she tried to kill him. She also remembered the exact date of the crime at trial, a year and a half later. Yet, although complainant stated at trial that defendant had done "the same thing" on previous occasions, she had no idea of

when the previous events took place or how frequently.

There was also testimony by defendant, his wife and three disinterested witnesses that on various occasions when they had visited the Bracey apartment prior to the alleged incident, they had seen a man who was not complainant's mother's husband, lying on the bed or walking around in just his underwear. They said that Barnie was also present at these times. The apartment custodian testified that this same man paid the rent for the Bracey apartment. Barnie's mother denied all of this.

It appears from the record that defendant's wife often babysat for complainant, that complainant was often at defendant's apartment playing with his stepdaughter, and that she had stayed there overnight on occasion. Also, when Barnie's mother worked, defendant and his wife usually took Barnie with them on errands or shopping trips. However, on the day in question, when the complainant's mother was informed that defendant and his wife would be away shopping during the day, she instructed defendant's wife that Barnie was to stay home. Defendant's wife testified that just before they left at 12:30 p.m., she went to the Bracey apartment and told Barnie that she would have to stay home and that Barnie was angry at not being allowed to accompany them.

In addition, the record indicates that some time before the incident in question, while Barnie was visiting defendant's stepdaughter, defendant gave the complainant a spanking in an attempt to end one of her temper tantrums.

Finally, there is substantial evidence by a number of witnesses who knew defendant, his family, complainant and her mother that defendant had an excellent reputation in the apartment and among

his acquaintances for truth and veracity. As one witness stated: "All I know of this gentleman is good." The same witnesses indicated that complainant and her mother did not enjoy similarly good reputations.

The investigating officers testified that defendant was cooperative at all times. The arresting officer stated that after defendant was warned of his constitutional rights, he said "he didn't do it; and that he was glad to go in because he wanted to get it straightened out."

On appeal, defendant asserts that there is insufficient evidence to support his conviction. The conviction rests on three things: the complainant's testimony, the positive results of the medical examination and the fact that defendant possessed a white handkerchief with blue stripes when he was arrested, which was virtually identical to that described by complainant. There is also the testimony of complainant's mother and the investigating police officers to the effect that complainant told substantially the same story on the day of the alleged incident as she did a year and a half later at trial. If the complainant's testimony is believed, there is sufficient evidence to support the conviction. *People* v. *Warner* (1918), 201 Mich 547; *People* v. *Galinski* (1967), 6 Mich App 189; *People* v. *Panknin* (1966), 4 Mich App 19.

However, there is substantial evidence which tends to support defendant's assertions of innocence. We note with particular interest that the law has long viewed with apprehension charges of sexual assault by young girls in cases where the record raises serious questions of whether defendant is truly guilty. The danger that spite might lead to a fabricated assault or a malicious misidentification

is not to be lightly ignored.[4]  In *People* v. *Smallwood*
(1943), 306 Mich 49, the Court stated at p 54:

"In 3 Wigmore on Evidence (3d ed), p 460 *et seq.*,
quotations are given from many leading authorities
showing that errant young girls frequently have
psychic complexes that lead them to contrive false
charges of sexual offenses by men, resulting some-
times in expressions of imaginary sex incidents of
which the narrator is the heroine or the victim."

Thus where, as here, the record presents an ex-
ceptionally difficult question of guilt in the psycho-
logically complicated[5] and emotionally charged con-
text of a sexual offense, the courts have treated the
cases as *sui generis*[6] and have found reversible error
in points which might otherwise pass unnoticed.  As

---

[4] *People* v. *Stanley* (1967), 67 Cal 2d 812, 819, 820 (433 P2d 913,
918, 63 Cal Rptr 825, 830):
"It should be remembered that an accusation of violations of the
sections before us [sex offense against a minor] is an ' "accusation
easily to be made and hard to be proved, and harder to be defended
by the party accused though ever so innocent" ' (*People* v. *Huston*,
45 Cal App 2d 596, 597, 114 P2d 607, 608), and that *there 'is
no class of prosecutions attended with so much danger, or which
afford so ample an opportunity for the free play of malice and
private vengeance.'* "
See, also: *People* v. *Byrd* (1948), 88 Cal App 2d 188 (198 P2d
561).
[5] In *People* v. *Hurlburt* (1958), 166 Cal App 2d 334, 338, 339
(333 P2d 82, 85), the Court noted:
"[C]ourts have not been blind to the possibility that a prosecutrix
may be untruthful in such cases, and that a defendant is practically
powerless to defend against such a charge.  Dean Wigmore felt
so strongly about the problem that he recommended that the rule
be, by statute if necessary, that the complaining witness, in all such
cases, should be subjected to a psychiatric examination.  III Wig-
more on Evidence, § 924a, p 459."
[6] The peculiar nature of such cases was emphasized in *People* v.
*Murphy* (1963), 59 Cal 2d 818, 831, 31 Cal Rptr 306, 314 (382 P2d
346, 354):
"It has long been recognized that 'In this class of prosecutions,
the defendant, owing to natural instincts and laudable sentiments
on the part of the jury, and the usual circumstances of isolation
of the parties involved at the commission of the offense [whether
real or fabricated], is, as a rule, so disproportionately at the mercy
of the prosecutrix's evidence that he should be given the full measure
of every legal right in an endeavor to, maintain his innocence.'
(*People* v. *Baldwin* [1897], 117 Cal 224, 249, 49 P 186.)"

the proofs on each side approach equality, even a minor error takes on disproportionate significance.[7]

In *People* v. *Smallwood, supra,* the Court was faced with a charge by a minor girl that her father had raped her. A review of the record left serious doubt of guilt.[8] The trial court had refused to allow the defendant to ask the complaining witness whether she had a juvenile record. Although the court apparently held that the question could have been answered only "yes" or "no" and that no details of the record could be established, failure to allow the question constituted reversible error.[9] See also, *People* v. *Brocato* (1969), 17 Mich App 277.

Similarly, in some jurisdictions where the evidence is exceptionally close, some courts have held that failure by the trial court to instruct the jury that charges of sexual assault are easily made and

---

[7] As the Court noted in *People* v. *Byrd, supra,* footnote 4 at p 562:

"The courts have frequently remarked that in cases of this nature the very accusation arouses feelings of revulsion and animosity which impose upon the trial judge the highest standards of fairness in the conduct of the trial. It will suffice to quote the following from *People* v. *Long,* 63 Cal App 2d 679, 686, 687, 147 P2d 659, 663:

" 'It is well understood that cases of this type must be tried with the utmost fairness and impartiality in order that the defendant may receive a fair trial. * * * *Errors committed either by the prosecution or by the court in the course of the trial, which ordinarily might be considered trivial and as of no material consequence from a standpoint of adverse effect upon the rights of a defendant, may become of great importance when committed in a case of the character of that here involved.' "* (Emphasis supplied.)

See, also, *People* v. *Musumeci* (1955), 133 Cal App 2d 354 (284 P2d 168).

[8] The dissenting opinion in *People* v. *Smallwood* (1943), 306 Mich 49, observed at p 57:

"A reading of Mr. Justice Butzel's entire opinion leads to a fair inference that the real reason therein for reversal and granting a new trial is because the conviction was against the great weight of the evidence and that the motion for new trial should have been granted."

[9] For other cases holding that peculiar nature of sex offenses requires an unusually broad scope of cross-examination, see *People* v. *Murphy, supra,* (footnote 6) at p 354, and cases cited therein. See, also, *People* v. *Hurlburt, supra,* (footnote 5); and *State* v. *Jones* (1941), 62 Idaho 552 (113 P2d 1106).

difficult to defend against,[10] after such a charge is requested, is reversible error. *People* v. *Vaughan* (1933), 131 Cal App 265 (21 P2d 438); *People* v. *Garrett* (1938), 27 Cal App 2d 249 (81 P2d 241)[11]; *Conners* v. *State* (1879), 47 Wis 523 (2 NW 1143); *Reynolds* v. *State* (1889), 27 Neb 90 (42 NW 903); *Cf. State* v. *Patrick* (1891), 107 Mo 147 (17 SW 666).

It is within this context that we view defendant's second claim on appeal. Defendant argues that the white handkerchief with blue stripes, containing certain unidentified stains, found in his possession after his arrest should not have been admitted into evidence. The defense strenuously objected to admission of the handkerchief below, but was overruled.

The basis of defendant's contention is that before trial the prosecution did not have the handkerchief chemically analyzed to determine whether the stains contained traces of semen. It is argued that failure to make a chemical analysis resulted in an inadequate foundation to admit the handkerchief into evidence.

The prosecution argues that failure to analyze affected the weight, not the admissibility, of the evidence. It is also argued that the fact that scientific tests might have been made in showing the defendant's connection with the crime charged does not make evidence inadmissible.[12]

---

[10] This charge is often called "the caution of Lord Hale." See 1 Hale's Pleas of the Crown, 634; *Wilson* v. *State* (1954), 49 Del 37 (109 A2d 381).

[11] In *People* v. *Garrett* (1938), 27 Cal App 2d 249 (81 P2d 241), it appears that failure to give the cautionary instruction to the jury was the sole basis of the reversal.

[12] The prosecutor cites only *People* v. *Allen* (1958), 351 Mich 535 in support of this position. In *Allen* defendant argued (at 548): "that it was the duty of the people to have *exhausted all scientific means.*" (Emphasis supplied.) *Allen* is, thus, fundamentally different from the instant case where the prosecutor made no scientific tests whatsoever in a case where the significance of an analysis for sperm traces was obvious.

We cannot agree with the prosecutor's position, for as is pointed out in McCormick, Evidence, § 152, at p 319:

"Relevant evidence, then, is evidence that in some degree advances the inquiry, and thus has probative value, and is prima facie admissible. But relevance is not always enough. There may remain the question, is its value worth what it costs? There are several counterbalancing factors which may move the court to exclude relevant circumstantial evidence if they outweigh its probative value."

The results of the medical examination which was performed on complainant established sexual contact with someone. Yet, in light of the testimony indicating complainant's vengeful nature (as illustrated by the knife incident) and the major attack on her credibility and morality, not to mention defendant's strongly supported alibi, there was a serious question at trial as to the true identity of complainant's assailant.

The stained striped handkerchief found on defendant only two hours after complainant stated her assailant had wiped off semen with an identical handkerchief constituted the strongest link in the evidentiary chain. Without it the prosecution would have been left with only complainant's heavily impeached testimony.

At trial the reason for the failure to make the chemical analysis was explained away thus: "because if there were semen stains on the handkerchief, it would be no indication when it was put on there or who placed the semen stain on there, so it would be immaterial." Yet, following defendant's conviction a chemical analysis of the handkerchief was performed by the Detroit Police Department Scientific Bureau. The test established that there were

no traces of sperm on the handkerchief. We consider that even assuming that the *existence* of the semen would be immaterial, that *absence* of such stains would be material.[13] The jury may well have found it incredible (if not impossible) that defendant would possess a handkerchief with dried stains[14] only two hours after it had supposedly wiped off semen, and yet have no traces of semen on it. In any event, it certainly has substantially reduced the prejudicial effect of the handkerchief.

Nearly a century ago Justice CHRISTIANCY stated in *Hurd* v. *People* (1872), 25 Mich 404:

"The prosecutor in a criminal case, is not at liberty, like a plaintiff in a civil case, to select out a part of an entire transaction which makes against the defendant, and then, to put the defendant to the proof of the other part, *so long as it appears at all probable from the evidence, that there may be any other part of the transaction undisclosed; especially, if it appears to the court that the evidence of the other portion is attainable.* The only legitimate object of the prosecution is, 'to show the whole transaction, as it was, whether its tendency be to establish guilt or innocence.' The prosecuting officer represents the public interest, which can never be promoted by the conviction of the innocent. His object like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success. And however strong may be his belief of the prisoner's guilt, he must remember that, though unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained, is unjust and

---

[13] Cf: MCLA § 722.716 (Stat Ann 1957 Rev § 25.496), which provides that blood tests may be used to acquit in paternity suits but may not be used to prove paternity.

[14] The dried character of the stains perhaps suggesting to a jury that the handkerchief probably was not recently laundered.

dangerous to the whole community." (Emphasis supplied.)[15]

The fact that the prosecution merely failed to obtain the evidence rather than actively suppressed evidence already in hand is of no consequence here. We consider that the significance of the possible absence of semen made a chemical analysis a necessary part of the prosecutor's duty "to take care that the innocent should be protected" (*People* v. *Davis* [1884], 52 Mich 569, 573), and that such examination was a prerequisite to admission.

The prosecutor argues in his brief that *"there could be no inference [sic] that the handkerchief contained semen."* (Emphasis by the prosecutor.) Yet, even acknowledging that no witness stated flatly that the stains were semen and that complainant never positively identified *defendant's* white handkerchief with blue stripes as *the* white handkerchief with blue stripes used in the crime, we cannot accept the prosecutor's assertion. We find the implication that the stains were semen was overwhelming, when the complainant's testimony as to how the handkerchief was used is considered in conjunction with the proximity of the time between the alleged crime and arrest, and the distinctive coloring of the article and the existence of stains.[16]

---

[15] Among the numerous cases which reiterate the same rule are: *Wellar* v. *People* (1874), 30 Mich 16, 22; *People* v. *Davis* (1884), 52 Mich 569, 573; *People* v. *Carr* (1887), 64 Mich 702, 708; *People* v. *Tann* (1949), 326 Mich 361, 367. Cf: *People* v. *Semchena* (1967), 7 Mich App 302, 312; *Giles* v. *Maryland* (1967), 386 US 66, 98 (87 S Ct 793, 809, 17 L Ed 2d 737, 758).

[16] In summation before the jury the prosecutor argued:

"[I]f you recall, she said that the man used a white handkerchief with blue stripes and wiped off her legs. And later on you heard the testimony that a white handkerchief with blue stripes was found on the defendant. And it is now in evidence. You can examine it."

The record on appeal indicates that the members of the jury did inspect the handkerchief.

In the absence of a chemical analysis, the proper foundation was not established for the admission of the handkerchief.  Because of the obviously highly prejudicial effect of its admission and in light of the negative result of the analysis, when finally conducted, we find its admission to be reversible error.

Reversed and remanded.

All concurred.