# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DARYL BRUCE MASON,

       Defendant-Appellant.

UNPUBLISHED
April 19, 2016

No. 325106
Wayne Circuit Court
LC No. 13-002013-FC

Before: O'CONNELL, P.J., and MARKEY and O'BRIEN, JJ.

PER CURIAM.

Defendant, Daryl Bruce Mason, was convicted by a jury of assault with intent to do great bodily harm less than murder (AGBH), MCL 750.84, and sentenced as a third-offense habitual offender, MCL 769.11, to two-and-a-half to 20 years in prison. He appeals as of right his judgment of sentence. We affirm.

This case arises out of an altercation between defendant and his then-girlfriend, Anita Moreno, in October of 2012. On the evening of October 18, 2012, defendant, Moreno, and two other friends were in downtown Detroit drinking alcohol, smoking marijuana, and "having a good time." At some point in the evening, the group left the downtown area, and Moreno drove defendant to his home. Defendant, who had became angry because he thought Moreno was flirting with one of the friends, slapped Moreno across the face during the commute. After being slapped, Moreno dropped defendant off at his home and returned to hers where her mother and son resided. Defendant apparently remained angry. He telephoned Moreno several times, calling her a "whore," "whore, fucking bitch," and "fucking whore" several times during the calls. Eventually, Moreno tried to go to sleep.

At approximately 6:00 a.m. the following morning, Moreno awoke to the sounds of rocks hitting her bedroom window. She went downstairs and opened the door, and defendant pushed his way into her home to discuss the prior evening. After some time, Moreno told defendant to leave and proceeded upstairs. Rather than doing so, defendant followed Moreno upstairs, continued calling her derogatory names, and expressed his hopes that her "son gets molested." Moreno responded by slapping defendant, and defendant countered by striking her multiple times and covering her face with a pillow when she began yelling for help. Moreno's mother, hearing "talking, yelling, [and] crying" from the bedroom, opened the door and found defendant

-1-

pressing a pillow against Moreno's face while Moreno was kicking and struggling to get free. She confronted defendant, and defendant asked her if she "want[ed] some too, bitch?"

Once she was able to get out from underneath the pillow, Moreno ran to protect her mother and begged her to leave the bedroom. Her mother left the room and called 911 several times as well as her son, Detroit Public Schools Police Officer Rudy Garcia, seeking assistance. Meanwhile, defendant's assault on Moreno continued. He began choking her, causing her to lose consciousness. Moreno eventually regained consciousness and found defendant "slapping [her] face," apologizing for his behavior, and crying. Moreno tried to console defendant and encouraged him to leave the residence once she learned that her mother had called the police. At this point, Garcia arrived at the home, entered, and found Moreno and defendant descending on the stairs. Garcia ordered defendant to "[g]et down on the floor." Defendant did not. Instead, he confronted Garcia, who was armed with a firearm, and promised "to fucking kill [him.]" Defendant then lunged at Garcia, and Garcia shot defendant once. Defendant was charged with assault with intent to commit murder, MCL 750.83, the jury found defendant guilty of the lesser offense of AGBH, MCL 750.84, and he was sentenced as described above. This appeal followed.

On appeal, defendant first argues that there was insufficient evidence to support his AGBH conviction. Specifically, he claims that there was insufficient evidence to prove that he specifically intended to harm Moreno while suffocating and choking her. Instead, he claims, he was merely trying to keep her quiet.

Sufficiency of the evidence claims are reviewed de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt." *Id*. On appeal, we "will not interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses." *People v Ortiz*, 249 Mich App 297, 300-301; 642 NW2d 417 (2001). That is, "a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Additionally, "[t]he scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id*. (citation and internal quotation marks omitted).

To convict defendant of AGBH, the prosecution was required to prove the following beyond a reasonable doubt: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm *less than murder*." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (citation and internal quotation marks omitted; emphasis in original). "[I]ntent to do great bodily harm" is "an intent to do serious injury of an aggravated nature." *Id*. (citations and internal quotation marks omitted). "Intent may be inferred from all the facts and circumstances." *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011). Additionally, "[a] defendant's intent may be inferred from his acts." *Id*. (citation and quotation marks omitted; alterations in original). "A specific intent crime requires a particular criminal intent beyond the act done, while a general intent crime requires merely the intent to perform a proscribed physical act." *People v Whitney*, 228 Mich App 230,

254; 578 NW2d 329 (1998). AGBH is a specific intent crime; therefore, the defendant must have the requisite intent "to do serious injury of an aggravated nature." *Brown*, 267 Mich App at 147. "Because of the inherent difficulty in proving a defendant's state of mind, only minimal circumstantial evidence from which intent may be inferred need be presented." *Cameron*, 291 Mich App at 615.

In this case, we conclude that the prosecution presented sufficient evidence to prove beyond a reasonable doubt that defendant had the specific intent "to do serious injury of an aggravated nature." *Brown*, 267 Mich App at 147. While defendant claims that he was simply trying to quiet Moreno, another logical inference from defendant's acts, i.e., suffocating and choking her until she lost consciousness, is that defendant was indeed trying to cause serious injury of an aggravated nature. "[A] defendant's intent may be inferred from his acts." *Cameron*, 291 Mich App at 615. Defendant tried to suffocate Moreno with a pillow. He then proceeded to strangle her with his bare hands until she lost consciousness. Although defendant relies heavily on the fact that Moreno did not originally tell law enforcement specifically that defendant was trying to suffocate or kill her, this was presented to the jury, and, this Court "will not interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses." *Ortiz*, 249 Mich App at 300-301. Quite simply, a rational jury could have certainly found that defendant's actions here reflected his intent to cause serious injury.

Aside from ignoring the evidence that defendant pressed a pillow against Moreno's face while she was kicking and struggling to get free, and then followed that up by choking her until she lost consciousness, defendant's theory also ignores a variety of other evidence. For example, the evidence demonstrated that defendant only started suffocating and choking Moreno after she slapped him. It is certainly conceivable that a rational jury might have concluded that defendant's asphyxiation efforts immediately after being slapped were the product of violent retaliation rather than, as defendant claims, concern for waking others in the home. As a second example, defendant also ignores the fact that, in the middle of his suffocation efforts, he threatened Moreno's mother, asking whether she "want[ed] some too, bitch[.]" Perhaps defendant believes that this question was also an invitation to quiet Moreno mother's voice, but we are comfortable in concluding that a reasonable juror might conclude otherwise, i.e., that defendant also wanted to violently attack Moreno's mother once he was finished with Moreno. In short, a rational jury could have found beyond a reasonable doubt that by suffocating and choking Moreno, defendant specifically intended to cause her a serious injury of an aggravated nature. *Brown*, 267 Mich App at 147.

Defendant also argues on appeal that he was deprived of his constitutional right to due process because the prosecution and law enforcement failed to pursue various avenues of investigation in hopes of exonerating him in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Specifically, defendant claims that the prosecution and law enforcement were required to obtain medical records, if any, that existed regarding Moreno's injuries, her cell phone records, and generally any other evidence that could have been helpful.

Because this issue was not raised before the trial court, it is unpreserved for appellate review. *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011). Thus, it is reviewed for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). Plain error analysis requires three findings: (1) an error, (2) that is plain,

i.e., clear and obvious, and (3) which affects substantial rights. *Id*. at 763. A plain error will generally affect substantial rights when there is a showing of prejudice, i.e., where it is demonstrated "that the error affected the outcome of the lower court proceedings." *Id*. Once these three findings are satisfied, reversal nevertheless remains discretionary: "reversal is warranted only when the plain . . . error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763 (citation and internal quotation marks omitted).

"There is no general constitutional right to discovery in a criminal case." *People v Greenfield (On Reconsideration)*, 271 Mich App 442, 447, n 4; 722 NW2d 254 (2006) (citation and internal quotation marks omitted). The exception to the general rule is that "due process requires only that the prosecution provide a defendant with material, exculpatory evidence in its possession." *Id*. To establish a *Brady* violation, a defendant must show: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 150 (citation and internal quotation marks omitted). However, *Brady* is only applicable to evidence that the prosecution or law enforcement has in its possession or control: "There is a crucial distinction . . . between failing to disclose evidence that has been developed and failing to develop evidence . . . ." *People v Green*, 310 Mich App 249, 256; 871 NW2d 888 (2015) (citation and internal quotation marks omitted). "Absent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process. Nor does due process require that the prosecution seek and find exculpatory evidence." *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003). "[N]either the prosecution nor the defense has an affirmative duty to search for evidence to aid in the other's case." *Id*. Therefore, "[a]lthough plaintiff is required to disclose evidence that has been developed, it is not required to develop evidence . . . ." *Green*, 310 Mich App at 256.

In this case, it is apparent that the prosecution and law enforcement were not required to seek and obtain any medical records reflecting Moreno's injuries, any pictures of her injuries, her phone records, or any other evidence that may have been helpful to defendant's case. Defendant cites *People v Jordan*, 23 Mich App 375, 388; 178 NW2d 659 (1970) (citation and internal quotation marks omitted), a nonbinding case, MCR 7.215(J)(1), relying on the following proposition:

> The fact that the prosecution merely failed to obtain the evidence rather than actively suppressed evidence already in hand is of no consequence here. We consider the significance of the possible absence of semen made a chemical analysis a necessary part of the prosecutor's duty to take care that the innocent should be protected . . . and that such examination was a prerequisite to admission.

Aside from the fact that we are not bound by *Jordan*, defendant's reliance on *Jordan* is misplaced because that case dealt with the admissibility of evidence, i.e., "such examination as a prerequisite to admission." *Id*. It had nothing to do with an alleged *Brady* violation.

Accordingly, the prosecution and law enforcement here were under no affirmative duty to investigate various avenues of inquiry suggested by defendant on appeal.

Affirmed.

/s/ Peter D. O'Connell
/s/ Jane E. Markey
/s/ Colleen A. O'Brien