*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CATRELL KEYSHAWN WOODS,

      Defendant-Appellant.

UNPUBLISHED
November 17, 2025
2:37 PM

No. 372664
Kalamazoo Circuit Court
LC No. 2023-001351-FC

Before: RICK, P.J., and O'BRIEN and MALDONADO, JJ.

PER CURIAM.

Defendant, Catrell Keyshawn Woods, appeals as of right his jury-trial convictions of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant, as a second-offense habitual offender, MCL 769.10, to 25 to 50 years' imprisonment for the murder conviction and two years' imprisonment for the felony-firearm conviction. We affirm.

## I. BASIC FACTS

This case arises from the May 11, 2023 shooting death of Omarre Williams. On that day, Williams was in the parking lot of the Riverview Cooperative Apartments in Kalamazoo, Michigan. At around 9:00 p.m., Williams, who had been socializing with others, went to retrieve his phone that had been charging in his aunt's parked car on the north side of the parking lot.[1] Gunshots rang out, and Williams was next seen lying on the ground. Friends and family members picked Williams up, placed him in the aunt's vehicle, and drove him to the hospital. Williams did

---

[1] Of some significance, the parking lot is described as being broken into two halves: a northern side and a southern side, with the northern side being at a slightly higher elevation than the southern side.

not survive, and a pathologist determined that Williams died from a gunshot wound that entered the right, backside of his head and exited through the left forehead.

After police responded, they conducted a search and investigation of the area. The vehicle that Williams was near at the time he was shot was backed into a parking spot on the north side of the parking lot, i.e., the vehicle was facing south. The vehicle was struck at least two times by gunfire. The trajectory of the shots was from the rear passenger side toward the driver's front side. They found eight spent cartridges on Bridge Street, just west of the entrance to the parking lot.[2] The cartridges were from two interchangeable types of ammunition: .223 caliber and 5.56 caliber.[3] And in the parking spot where Williams had been, the police saw a pool of blood and recovered a fired bullet. A resident in a unit southeast of where Williams had been shot reported damage to her second-floor bathroom after hearing the gunshots. Police found that a bullet entered through the brick wall of the apartment and caused the damage. Extrapolating the trajectory of the bullet from the path it took through the brick wall, police determined that the trajectory was at a downward angle toward the northwest, which is in the direction of the area where Williams was shot and where the casings were found on Bridge Street.

The police also found a spent nine-millimeter casing on the south side of the parking lot. But the police did not find any damage that was caused by any shot being fired in a northerly direction from the south parking lot. Further, Williams's aunt, who was on a porch facing the southern end of the parking lot at the time of the shooting, testified that the shots came from the direction of Bridge Street. Based on this evidence, the police determined that the nine-millimeter casing was not related to the shooting of Williams.

Det. Sean Szekely, the lead detective assigned to the case, had heard a report of a black car fleeing the area westbound on Bridge and had another officer review security footage from a nearby party store. The officer went to the nearby "13½ liquor store" and obtained video footage from it. The video showed a black Ford Fusion arriving in the area approximately 30 minutes before the shooting and leaving at a high rate of speed a little before 9:00 p.m. A review of images collected by nearby Flock cameras[4] revealed the license plate number of the vehicle.[5] Flock images and the videos from the liquor store also showed that the Ford Fusion had distinctive

---

[2] Bridge Street runs east-west, and is on the north side of the parking lot.

[3] There was testimony that some manufacturers use "inches" for measurement, resulting in a .223 nomenclature, while others use "millimeters," resulting in 5.56 label; .223 inches is very close to 5.56 millimeters. Regardless, multiple witnesses testified that .223-caliber and 5.56-caliber ammunition can be interchangeable.

[4] The city of Kalamazoo had more than 20 such cameras located at various intersections within the city. The cameras attempt to capture images of vehicles' license plates, and the license-plate data goes into a database.

[5] The vehicle was registered to defendant's sister.

stickers on the rear of the vehicle, a broken driver's side taillight, and a broken driver's side mirror that was hanging down.

The police the next day conducted a stop of the Ford Fusion. Defendant was the driver. During a search, a loaded AR-style rifle was located in the trunk area, and a cell phone was found. Defendant denied any knowledge of the rifle and claimed that he had never seen the rifle or touched it. There was something similar to a shoelace attached to the rifle. While the loaded magazine had a 30-round capacity, only 22 rounds were remaining.

Defendant's DNA was found on the rifle. Further, videos and photos obtained from defendant's iCloud and Snapchat accounts show him wielding a rifle with the same identifiable lace or string as the rifle found in the Ford Fusion.[6] Ballistics testing revealed that all eight spent cartridges that were retrieved from Bridge Street were fired from the rifle found in the Ford Fusion. The bullet found in the parking spot where Williams was shot was consistent with being a .223 or 5.56 caliber. Additionally, cell-phone tower-usage records placed defendant's phone near the Riverview Apartments near the time of the shooting and, as corroborated through Flock images, generally matched the location the Ford Fusion that day.

Defendant was charged with open murder and felony-firearm. Defendant did not testify or offer any other witnesses, but his main defense was that the prosecution did not meet its burden of proving guilt beyond a reasonable doubt. During closing argument, defense counsel focused on the fact that there was no evidence that any shot from the rifle was the cause of Williams's death and that the police never adequately investigated the nine-millimeter casing. The jury convicted defendant of second-degree murder on the open-murder count and convicted him of felony-firearm. This appeal followed.

## II. DISCUSSION

### A. REFERENCES TO "MURDER WEAPON"

Defendant argues that testimony from two police witnesses referring to a weapon found in the trunk of the vehicle defendant was driving as the "murder weapon" denied him a fair trial. We disagree.

Although defendant frames his issue as one of prosecutorial misconduct, his trial counsel successfully objected to the testimony, resulting in the trial court striking the inappropriate references to the "murder weapon" by the police witnesses. Defendant's actual argument on appeal appears to be that the trial court should have granted a mistrial because of the prejudicial nature of the comments. Defendant never requested a mistrial; accordingly the issue is not preserved. See *People v Haynes*, 338 Mich App 392, 410; 980 NW2d 66 (2021); *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). Unpreserved issues are reviewed for plain error affecting defendant's substantial rights. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530

---

[6] As will be explained in greater detail below, two different witnesses referred to the rifle as the "murder weapon." Defendant objected in each instance, and the trial court sustained the objection, instructing the jury to disregard the inappropriate comments.

(2007). To prevail, a defendant bears the burden of showing that "(1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). An error that affected substantial rights is one that affected the outcome of the lower-court proceedings. *Id.* at 356.

To the extent defendant asserts that he is entitled to a new trial on the basis of prosecutorial misconduct, it is important to recognize that he never identifies any conduct on behalf of the prosecutor that his claim is based on. Instead, defendant relies solely on the characterizations of the two police witnesses. During the examination of Det. Szekely, the following exchange occurred:

> *Q.* And, what are we observing in this video [stored in defendant's Apple iCloud account]?
>
> *A.* I know it's kind of hard to see with the glare on the screen here. But, this video shows [defendant] with the murder weapon that was used during this case.
>
> [*Defense Counsel*]: Objection. That calls for a legal conclusion of what weapon was used as the murder weapon.
>
> *THE COURT*: And, the objection is sustained. Please, disregard the last comment that the witness just mentioned. It's not appropriate for it to be referred to that way.

Det. Szekely apologized and simply referred to the weapon in the video as looking similar to the one found in the Ford Fusion.

The prosecution later asked a different police witness, Michael Fry, who was an intelligence analyst and manager in the Kalamazoo Department of Public Safety, about similar videos found in defendant's accounts:

> *Q.* Okay. And what is this like?
>
> *A.* This is a video recovered from the search warrant to Apple for the iCloud account associated to [defendant]. And, this is a video of the defendant, . . . holding a firearm, driving down Hayes Park Avenue on the south side on April 30th.
>
> [*The Prosecutor*]: And, that was evidence number 80. Next.
>
> *Q.* All right.
>
> *A.* Now, we go to May 6th of 2023. This is approximately five days before the homicide. This is from the defendant's Snapchat account. The Snapchat account is pulled off of the cellular device that we gained extraction from, AI-74G. This associates an individual that has a birthday of 2-13-2003, last active on May 12th of 2023, and it's active. And, the verified phone number is the device that we are mapping phone records for, associated to [defendant].

[*Defense Counsel*]: Objection. He made the statement "murder weapon" again. That's inappropriate.

*THE COURT*: [Mr. Prosecutor]?

[*The Prosecutor*]: I agree.

*Q*. If we could just refer to it as a weapon.

*THE COURT*: Ladies and Gentlemen, please disregard the comment that the witness just made. It is not for your consideration.

At the outset, the transcript does not reflect that Fry mentioned "murder weapon," and from his testimony, it is hard to see where it would have been. Unless there is an entire paragraph missing, Fry only was discussing the metadata of the video, not what the video actually depicted. Regardless, because the prosecutor "agree[d]," we will accept that Fry made the reference to "murder weapon."

Defendant does not identify what the prosecutor did that forms the basis of his claim of prosecutorial misconduct, and we can find none. From the above exchanges, it is evident that the prosecutor did not ask any inappropriate questions or otherwise seek to elicit the inappropriate responses. In both instances, the witnesses volunteered their responses. Thus, to the extent defendant avers that the prosecutor engaged in prosecutorial misconduct, that argument is without merit.

However, the gravamen of defendant's argument is that the prejudice introduced by the police officers' testimony referring to the firearm they found as the "murder weapon" was so severe that the trial court should have granted a mistrial. "The trial court should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way." *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014) (quotation marks and citations omitted). "The trial court may consider, among other things, whether the prosecutor intentionally presented the information to the jury or emphasized the information." *Id*.

Defendant has failed to show how his right to a fair trial was violated. While the two witnesses referred to the firearm defendant was wielding in the videos and pictures as the "murder weapon," those references had minimal impact. First and foremost, the trial court instructed the jury to disregard the witnesses' characterizations of the weapon. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Second, it was clear that the witnesses were not speaking with some type of "hidden knowledge" about the firearm. In other words, the witnesses were not relying on or referencing any other scientific testing whose results were inadmissible—

they were instead expressing the clear inference from the overwhelming admissible evidence.[7] While the testimony referring to the firearm as the "murder weapon" was inappropriate, see MRE 602,[8] the charaterizations did not unfairly prejudice defendant.

Indeed, after making the comment, Det. Szekely admitted that there was no scientific evidence to conclusively say which weapon fired the fatal shot. Thus, there is no reason to suggest that the jurors placed any undue weight on any "murder weapon" references, in light of the officer-in-charge explicitly agreeing that no such direct evidence exists and in light of the trial court's explicit instructions.

We also note that defense counsel was able to turn these comments against the prosecution. During closing argument, defense counsel addressed the erroneous comments head on:

> They kept referring to it as the murder weapon to try to get you to connect the dots that they don't have connected. They're trying to cut corners and they're hoping that you will allow them to cut these corners. No evidence as to what weapon hit Mr. Williams.

Thus, aside from generally being able to argue that the prosecution failed to meet its evidentiary burden of proving guilt beyond a reasonable doubt, the witnesses' comments allowed defense counsel to highlight how the police and prosecution may have been trying to "cut corners" to prove guilt, which undermines their case.

---

[7] That overwhelming circumstantial evidence includes, at a minimum, (1) the firearm found in the Ford Fusion matches the firearm in the photos and videos of defendant; (2) while the firearm had a capacity for 30 rounds, only 22 were in the loaded magazine; (3) eight spent casings were found in on Bridge Street, where defendant had driven the Ford Fusion; (4) those eight casings were identified as being shot from the firearm recovered from the Ford Fusion; (5) defendant was seen arriving on Bridge Street shortly before the shooting and departing at a high rate of speed immediately afterward; (6) defendant's DNA was found on the firearm; (7) the trajectory of shots being fired from Bridge Street is consistent with the other physical evidence, including damage to Williams's aunt's car and damage to the one apartment; and (8) defendant's denial of having any knowledge of the firearm, when the evidence emphatically establishes that this was not true.

[8] MRE 602 requires a witness to have personal knowledge of the subject of the testimony, and the witnesses did not have any such personal knowledge about which weapon fired the fatal shot. Additionally, MRE 701 provides that lay witnesses are allowed to express opinions or inferences only when those opinions or inferences are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." But it is not apparent that either of these conditions applies because the two witnesses did not base the inferences on their own perception of events—they were simply inferring from the various collected evidence, and the inferences were not all that helpful because the inferences were obvious to any fact-finder.

In sum, defendant has failed to show that he is entitled to a new trial on the basis of the stricken testimony referring to a "murder weapon."

Defendant alternately argues that his trial counsel was ineffective by failing to request a mistrial. Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

Defendant's claim of error fails because any such request for a mistrial would have been futile. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument . . . does not constitute ineffective assistance of counsel."). For the reasons described above, had counsel requested a mistrial, the trial court would have denied the request. Any prejudice was cured by the court's instructions and by Det. Szekely's admission that no evidence exists to positively link defendant's firearm with the fatal shot.

Defendant also argues that his trial counsel should have requested a curative instruction. This argument is perplexing because in each instance, the trial court explicitly provided a curative instruction. With the court sua sponte instructing the jury to not consider the "murder weapon" references, it was wholly reasonable for counsel to not make a redundant request.

## B. FAILURE TO INVESTIGATE

Defendant argues that his right to due process was violated through the police's failure to fully investigate the nine-millimeter casing that was found in the southern part of the parking lot. We disagree. We review this unpreserved issue for plain error affecting defendant's substantial rights. *Hanks*, 276 Mich App at 92.

In support of his argument, defendant relies on caselaw emanating from *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). "A criminal defendant has a due process right to obtain exculpatory evidence possessed by the prosecutor if it would raise a reasonable doubt about defendant's guilt." *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005); see also *Brady*, 373 US at 87. In order to establish such a due-process violation, a defendant must prove "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014), citing *Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Chenault*, 495 Mich at 150, citing *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972). "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Chenault*, 405 Mich at 150.

However, fatal to his claim of error, defendant has identified no evidence that the prosecution possessed that it failed to disclose. Instead, he argues that the police should have more fully investigated the nine-millimeter casing. But due process does not require the police to seek

-7-

and find exculpatory evidence. *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003); see also *People v Burwick*, 450 Mich 281, 289 n 10; 537 NW2d 813 (1995) ("Neither the prosecution nor the defense has an affirmative duty to search for evidence to aid the other's case."). Moreover, assuming that there was such a duty to further investigate the nine-millimeter casing, defendant has failed to show how the outcome of the trial would have been different. As a result, defendant's argument is without merit.

We further note that defendant's reliance on *People v Jordan*, 23 Mich App 375; 178 NW2d 659 (1970), is misplaced. In *Jordan*, this Court held that a handkerchief allegedly used to clean up the defendant's semen following a sexual assault should not have been admitted without chemical testing confirming it contained semen. *Id*. at 385-389. However, this holding was not based on the principle that the police or prosecution have a duty to investigate. Instead, it was based on the principle that the prosecution, by failing to have the handkerchief tested, had failed to lay a proper foundation for its admission. *Id*. at 389. Defendant's argument on appeal has nothing to do with providing a necessary foundation for the admission of evidence, making *Jordan* inapposite.

## C. OFFENSE VARIABLES

Defendant next challenges the scoring of two offense variables (OV), OV 3 and OV 9. Neither argument has merit.

This Court is to review a trial court's factual determinations with respect to the scoring of offense variables for clear error, and those findings must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). A factual finding is clearly erroneous when the reviewing court is left "with a definite and firm conviction that a mistake has been made." *People v McElhaney*, 215 Mich App 269, 273; 545 NW2d 18 (1996). But this Court reviews de novo whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute. *Hardy*, 494 Mich at 438.

Michigan's sentencing-guideline statute factors in the severity of any victim's physical injury caused by a defendant by calculating the OV 3 score. MCL 777.33. A sentencing judge is to score points ranging from 100 for causing a death down to zero for causing no physical injury to any victim. MCL 777.33(1)(a)-(f). However, the statute explicitly provides that 100 points for causing a death is not to be scored if the sentencing offense is a homicide crime. MCL 777.32(b). A homicide crime is defined as one in which the death of a person is an element of the crime. MCL 777.1(c). For OV 3, 25 points are scored if the victim suffered a life-threatening or permanent-incapacitating injury. MCL 777.33(1)(c). The sole issue here is whether defendant was properly scored 25 points for OV 3, causing a life-threatening injury, when he killed his victim with a gunshot wound to the head.

Both parties acknowledge that the Supreme Court case of *People v Houston*, 473 Mich 399; 702 NW2d 530 (2005), is controlling. In *Houston*, the defendant shot and killed the victim with a single shot to the head and was convicted of second-degree murder. *Id.* at 402. The Court held that where a defendant kills a victim with a gunshot wound, that defendant obviously also caused a physical injury. *Id.* Furthermore, just because the victim eventually dies does not mean that the victim did not suffer a *life-threatening* injury. Such a victim "sustained an injury so life-

threatening that it was followed by his death." *Id.* at 407 n 16. Therefore, the Court held that in such cases, 25 points is the proper amount to be scored for OV 3. *Id.* at 410.

Consequently, the trial court did not err by scoring OV 3 at 25 points in the instant case.[9]

OV 9 addresses the number of victims. Ten points are properly scored when "[t]here were 2 to 9 victims who were placed in danger of physical injury or death." MCL 777.39(1)(c). Conversely, zero points are appropriate when "fewer than 2 victims . . . were placed in danger of physical injury or death." MCL 777.39(1)(d). And for this OV, "each person who was placed in danger of physical injury" is considered a "victim." MCL 777.39(2)(a).

The trial court, while relying on testimony that placed multiple people in the parking lot and the number of shell casings shot from defendant's firearm, found that the number of "victims," i.e., the number of people placed in danger of physical injury, was between two and nine, and scored 10 points for OV 9.

In his brief on appeal, defendant states:

> The trial judge based his ruling on evidence that other people were in the parking lot at the time of the shooting. Detective Szekely said that he did not believe that the 9 mm casing found in the parking lot was of no [sic] concern based on his conversation with [the victim's aunt] who told him that no shooting occurred in the parking lot. She was the only person who spoke to him about what happened in the parking lot. He said he did not follow up because "there was no other leads." OV-9 should be scored at zero. [Citation to record omitted.]

Defendant's reference to Det. Szekely and the nine-millimeter casing are non sequiturs and have nothing to do with how many people were present and placed in danger of physical injury from the eight shots the jury attributed to defendant. Accordingly, defendant has abandoned the issue. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.").

Moreover, even if defendant had not abandoned the issue, the trial court's finding that there were multiple people in the parking lot is not clearly erroneous. The resident whose apartment suffered damage saw "a lot of people" running in the parking lot immediately after shooting, and Williams's aunt described seeing "all the kids" from the apartment complex in the parking lot and identified at least nine of them. One shot alone likely put many of these individuals in danger, but eight shots certainly placed many of them at risk of physical injury. Consequently, the trial court did not err by scoring OV 9 at 10 points.

---

[9] Of note, defendant acknowledges the binding nature of *Houston* and wishes to preserve the issue for appeal to that Court because only the Supreme Court can overrule its decisions. See *Paige v Sterling Heights*, 476 Mich 495, 524; 720 NW2d 219 (2006).

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues in his Standard 4 brief that he was denied the effective assistance of counsel through counsel's failure to consult experts. We disagree.

Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich at 578. Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich at 51. However, such performance must be measured without the benefit of hindsight. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

Defendant argues that *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), stands for the proposition that his trial counsel should have consulted with other experts. Defendant's reliance on *Ackley* is misplaced. In *Ackley*, the defendant was charged with first-degree felony murder and first-degree child abuse after his live-in girlfriend's young daughter died while in the defendant's care. *Id*. at 384. The prosecution called five different expert witnesses in support of its theory was that "the child died as a result of abusive head injury caused either by nonaccidental shaking, blunt force trauma, or a combination of both." *Id*. at 384. Defense counsel consulted with one expert, who said he did not think he could help, but he nonetheless advised counsel to consult with a particular expert, who "was significantly more likely to agree with the defendant's claim that the child's death . . . must have been accidental." *Id*. at 390. Notably, this initial expert informed trial counsel that the shaken baby syndrome (SBS)/abusive head trauma (AHT) diagnosis was not universally accepted within the medical community. *Id*. Despite having been allotted funding to hire experts and despite the referral to someone who may have been able to assist defendant, counsel did not consult anyone else. *Id*. at 384, 386. The Supreme Court ruled that counsel's failure to engage with the other expert was not reasonable. *Id*. at 392. This was especially true "in light of the prominent controversy within the medical community regarding the reliably of SBS/AHT diagnoses." *Id*. at 392.

Contrary to defendant's suggestion on appeal, *Ackley* does not stand for the proposition that trial counsel renders ineffective assistance whenever he fails to procure an expert to oppose a prosecution's expert. In the present case, defendant does not allege that there was any complex scientific evidence that needed to be explained or rebutted. There primarily were two types of scientific testing that implicated defendant's guilt. The first was DNA testing that, with a virtual

certainty, identified defendant's DNA on the rifle.[10]  The second testing of note is the tool-mark testing that established that the firearm found in the Ford Fusion was the firearm that ejected the eight casings on Bridge Street.  Defendant does not explain how an expert would have contradicted either of these tests.[11]

In sum, defendant has failed to show that counsel's decision to not produce any experts fell below an objective standard of reasonableness.  The science at issue here, contrary to the science in *Ackley*, was not of a "highly contested nature," and there is nothing in the record to show that, had defense consulted with some experts, a different scientific opinion would have been available, let alone one that would have created a reasonable probability of a different result.

Affirmed.

/s/ Michelle M. Rick
/s/ Colleen A. O'Brien
/s/ Allie Greenleaf Maldonado

---

[10] However, this testing was far from necessary.  The DNA's significance was lessened because of the videos and pictures that showed defendant wielding the rifle that was later seized from the Ford Fusion.  Regardless, DNA testing is generally accepted as reliable.  See *People v Lee*, 212 Mich App 228, 282-283; 537 NW2d 233 (1995) (holding that courts in Michigan may take judicial notice of the reliability of DNA testing using the PCR method).

[11] Aside from the tool-mark analysis, there was strong circumstantial evidence that defendant's firearm fired the eight shots: (1) defendant was in seen in that specific area at the time of the shooting; (2) he was seen leaving at a high rate of speed after the shooting; (3) shots being fired from Bridge Street is consistent with the other physical evidence, including the damage to the aunt's vehicle and the damage to the one apartment building on the east side of the complex; and (4) the firearm had 22 rounds in the chamber out of a capacity of 30, strongly suggesting that eight shots had been fired.