*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WALTER JEMISON,

        Defendant-Appellant.

UNPUBLISHED
December 17, 2025
10:16 AM

No. 369879
Ingham Circuit Court
LC No. 22-000467-FC

Before: ACKERMAN, P.J., and YOUNG and KOROBKIN, JJ.

PER CURIAM.

Defendant, Walter Jemison, appeals by right his jury convictions of assault with intent to murder, MCL 750.83, discharge of a weapon in or at a building, MCL 750.234b, and felon in possession of a firearm, MCL 750.224f. On appeal, defendant argues that he was prejudiced by prearrest delay, improperly admitted evidence, prosecutor misconduct, the omission of jury instructions, and related ineffective assistance of counsel. Defendant also argues that the trial court misscored Offense Variable (OV) 4, OV 5, OV 6, and OV 19 and that his sentence was disproportionate. Although we agree that defendant has identified some errors, we conclude after a thorough review of the record that reversal is not warranted. We therefore affirm defendant's convictions and sentences for the reasons set forth below.

## I. BACKGROUND AND FACTS

Trial testimony established that the shooting at issue in this case occurred on the night of August 20, 2021. Ryan Ordiway and his girlfriend Juliet Weekley were at their home in an apartment complex in Lansing when they heard a loud knock on their front door. Ordiway testified at trial that when he yelled "who is it," the person identified themselves as "Pooh." Ordiway and Weekley knew defendant by his "street name," "Pooh," as he regularly visited their apartment complex where they would give him a ride or he and Ordiway would engage in drug-related transactions. Ordiway used illicit substances including heroin and opiate pills, and cocaine on and

-1-

off, whereas Weekley denied any substance use. Weekley got up to answer the door while Ordiway put on his shoes in anticipation of a confrontation.

According to Ordiway, in the days leading up to the incident, defendant had been telling people that he and Weekley were working with the police.[1] Ordiway had texted defendant to demand that he stay away from Ordiway and the building, otherwise a physical altercation would occur.

When Weekley opened the front door, defendant backed up against the wall across from the apartment door with his arms behind his back and a confused look on his face, and asked where Ordiway was. When Ordiway went to the door moments later, he saw defendant bringing his arm from behind his back with a small black revolver. As Ordiway shut the door, the gun in defendant's hand went off while pointed toward Ordiway's face. Ordiway was wounded in the arm and shoulder, and had trouble breathing. Weekley immediately called 911. In the call, which was played at trial, Weekley stated that her boyfriend had been shot by a short Black man named Pooh, wearing a gray long sleeve shirt and shorts, that she didn't see the gun, and that she thought Pooh was still outside.

Officer Alexis Robertson of the Lansing Police Department responded to the scene at 9:34 p.m., where she observed a subject with a gunshot wound who was bleeding. Ordiway said that he had an argument with someone named Pooh earlier in the day and that he received a knock at his door and Pooh was there with a gun. On cross-examination, Officer Robertson clarified that she did not include in her report that Ordiway said Pooh shot him, but on redirect, explained that her recollection had been refreshed by watching her body-camera footage.

Weekley and Ordiway went to the hospital. Dr. Paul Schneider, a trauma surgeon at Sparrow Hospital in Lansing who treated Ordiway, testified that Ordiway's injuries were consistent with a gunshot wound. The bullet went from the right upper chest, across, and just below the sternum, so it missed any vital structures, but by less than an inch on each side. The bullet could be seen in a CT scan on the lower diaphragm, but was not removed because doing so would cause complications. Ordiway received serious injuries that could be life-threatening if left untreated, and was treated in the hospital for five days. On cross-examination, Dr. Schneider testified that Ordiway tested positive for cocaine and benzodiazepines that were not administered by the hospital.

The prosecutor elicited testimony from both Weekley and Ordiway about their feelings and anxieties related to the shooting and testimony from Ordiway about how he changed his life following the shooting. But each time that defense counsel objected on relevance grounds, the trial court overruled the objection. For example, when she first got on the stand, Weekley was questioned about how she felt about being in court, and she responded that she felt "overwhelmed" and "anxiety." Then, the prosecutor asked "tell me more about anxiety" and asked why Weekley

---

[1] This was true, as Weekley and Ordiway admitted that they provided information to the police about drug and gun transactions, including information involving defendant, although defendant was not the target. At trial, both witnesses denied that they were receiving any kind of benefit in exchange for their testimony and a stipulation to that effect was read to the jury as to Weekley.

was touching her chest. When the prosecutor asked, "when you woke up at 8:30, help me understand the first thing that you thought about," defense counsel objected on relevance grounds. The prosecutor responded that the impact of the occurrences in the case was relevant to the witnesses' credibility. The trial court overruled the objection and Weekley went on to testify that she thought about court and how the thought of reliving everything gave her anxiety. Weekley and Ordiway both testified that they were afraid to go back to the apartment after Ordiway was treated at the hospital because they were afraid that defendant would return. Over the defense's objection on relevance grounds, Ordiway explained that he no longer used substances, and had changed his life including his career and education, and had stopped providing information to the police.

During Weekley's cross-examination, defense counsel advanced a misidentification theory, pressing her on inconsistencies in her testimony by asking whether Weekley told police that she didn't see the gun and what the gun looked like, which she didn't remember, and then impeaching her with her statement in the 911 call. Counsel also asked whether Weekley, who wears glasses, wore them when speaking to police, to which she said yes, but Weekley acknowledged that a still image from police bodycam footage showed that she wasn't wearing her glasses. Counsel also pressed Weekley on her location in the doorframe next to Ordiway, who is six foot four and a large, muscular man, asking whether they could squeeze together in the doorframe and whether she lied to police about Ordiway blocking her vision. Weekley said she didn't remember and that the incident has been traumatizing, before asking for a break. In addition, defense counsel impeached Weekley on her testimony that defendant was wearing gray shorts, as she stated in a police interview that they were black.

During Ordiway's cross-examination, defense counsel pressed him on how he and Weekley could fit together in the doorframe given Ordiway's size, and Ordiway explained that Weekley was off to the side, not blocking the door, and not in the doorway itself. Ordiway spent about two seconds at the doorway before seeing Pooh, who was wearing dark shorts and a t-shirt. Ordiway denied telling detectives that defendant was wearing a jean jacket. He also denied having trouble with others in the neighborhood and did not have a previous confrontation with defendant besides the text messages.

Detective Jon Brady of the Michigan State Police in the Lansing major crimes unit testified that he was assigned to the case within about a day of the shooting incident. Detective Brady spoke to Ordiway at the hospital, who was lucid, able to speak, but had a weak voice. Police developed a description of the shooter, who went by the "street name" of "Pooh," was a lighter skinned Black male who was shorter, with a clothing description. A witness told him that Pooh's first name was possibly Walter. Detective Brady ran the information through law enforcement tools, and came back with Walter Jemison, who was approximately five foot three. At trial, defendant stood up for the jury to observe his height.

Later, Detective Brady returned to the hospital and conducted a photo lineup that included defendant with Ordiway and Weekley, respectively, in separate rooms. Ordiway and Weekley each separately identified defendant in the photo lineup. Detective Brady explained that no bullet casings were recovered from the scene, but that revolvers do not eject a casing. On cross-examination, Detective Brady admitted that police never investigated anyone else and relied entirely on the statements of the witnesses, and that he never visited the crime scene. Detective

Brady didn't have a reason to think the witnesses tried to get their stories straight because their statements were consistent with each other and over time.

After the prosecution rested, the defense called Officer Robertson again. On cross, Ordiway had said he wears contact lenses and denied wearing glasses. And on recross, Ordiway had denied that he smoked a cigarette after getting shot. But after being shown a picture from her body cam to refresh her recollection, Officer Robertson admitted that Ordiway was wearing glasses and smoking a cigarette.

Defendant took the stand in his own defense. Defendant testified that at the time of the incident, he lived about a mile away. At 9:00 p.m., defendant was around the house getting ready to leave. He was wearing blue shorts, and left around 9:15 p.m. to go around the corner to his in-laws' house, the Houstons, on MLK and Willow, where multiple extended family members and friends were present. Defendant was at the Houstons' from 9:20 p.m. to about 11:30 p.m., partying outside in their backyard. Then he went to a bar, the Elks Lounge. Defendant denied knowing that Ordiway and Weekley were police informants. He had not been in Lansing since April because his brother had been murdered. Defendant denied being at the apartment that night to visit Ordiway, whom he described as a friend, because Ordiway had sent threatening text messages. In fact, Ordiway's neighbor, Mike Williams, tried to convince him to go to the apartment complex to play games, but defendant refused.

On cross-examination, defendant explained that at the time, he lived with his fiancée, Cara Summerville, and her two children. He had just returned from Detroit a couple of days before. At some point in the evening other people were at his house to smoke weed and drink, including Mike, Cara, and others. When Mike and two others left to play games, defendant did not go because he was giving Ordiway time to cool off, suggesting that he wanted to continue communicating with Ordiway because he had sports cards that defendant wanted. Defendant denied having a problem with Ordiway and denied responding to his text messages. Defendant denied that the reason he said that he arrived at the party at the Houstons' at 9:20 p.m. was because the police report said that was when the police responded to the scene.

Defendant was questioned on cross about a phone call with his fiancée Cara the week of trial. Defendant denied being upset because her testimony was not matching up with what he wanted her to say. Defendant agreed that he had said, "he's not going to have you testify because you told them you ain't see me until 12 or 2 in the morning" but explained that Cara lies. After defendant denied saying "you know damn well I was at the house, Mike and I was over there, I did no fucking 12" and "you know that was nighttime when you came around. It wasn't no 12:00 or 2:00. I was at the house all fucking day," the prosecutor played the call for the jury. Defendant explained that he was trying to refresh Cara's memory. The prosecutor then questioned defendant about various witnesses that he wanted to testify for his alibi but who did not ultimately testify, including two witnesses who, according to defendant, remembered his previous altercation with someone named Raymond,[2] who had stolen clothes from defendant's car and pulled up to his house that night.

---

[2] No last name was provided.

The prosecutor then revisited defendant's testimony on direct that he did not know Ordiway and Weekley were police informants:

Q. Okay. You also indicated that you had no idea about any of the matters having to do with being a rat or having to do with drugs; correct?

A. That's correct.

Q. Okay. But, in fact, you've been involved with rats before; correct?

A. I guess.

Q. And taking care of rats?

A. No. Like I'm a hit man? I'm not taking care of rats.

Q. October 14 of 2023, you made a call to a friend and it was recorded. Is that fair to say?

A. Yes.

Q. In that call you indicated, "Hell, yeah. We had to take an N-word out. He was a rat. That N-word done told on Rico"?

A. No. I didn't take nobody out.

Q. Did you say that, sir?

A. That was jail matters.

Defense counsel objected on the ground that the evidence was improper impeachment, more prejudicial than probative, and could be construed as an "other act" despite defendant's lack of involvement. But the trial court allowed the statement to come in to impeach defendant if he denied saying what the recording captured.

The prosecutor then sought to impeach defendant on the locations and people related to his alibi, questioning him, for example, about the address of the Houstons' house, which defendant did not know, but could describe via its cross-streets. On redirect, defendant explained that the call with Cara was about something that defendant had seen that had nothing to do with him and was just "street talk"—a guy had "ratted" on another guy about drugs, he "got jumped," and defendant witnessed it. Defendant estimated that Raymond, who had stolen his clothing, pulled away in his vehicle around 9:40 or 9:45 p.m. On recross, defendant explained that around 11:30 or 11:45 p.m. he went to a bar with his uncle, who picked him up, and he went home afterward.

In response to the juror question, "please describe your reaction to your friend Ryan being shot," defendant responded that Ordiway had gotten what he deserved because he was robbing drug dealers and had many problems with other people. On redirect, defendant explained that he was concerned about Ordiway as a friend, but that he was getting out of line. On recross, defendant

reaffirmed that Ordiway got what he deserved, and on redirect, defendant said that he still felt concern because Ordiway was a good friend. Defendant explained that he would protect Ordiway by paying debts for him, and because people knew they were friends, they would approach him about Ordiway's behavior. But, defendant said, he couldn't protect Ordiway when he robbed drug dealers.

After the close of the defense's case, the parties agreed on the jury instructions except as to an addict-informer instruction, and the trial court denied the defense's request for it as to Ordiway. And after deliberating for around five hours, the jury convicted defendant as charged.

The trial court sentenced defendant to 30 to 60 years on the assault with intent to murder (AWIM) conviction, to be served concurrently with sentences of 5 to 10 years for discharge of a weapon in or at a building and 3 to 5 years for felon-in-possession. The controlling sentence of 30 to 60 years was within the guidelines range of 22.5 to 37.5 years (270 to 450 months). Defendant now appeals.

In this Court, defendant moved to remand for an evidentiary hearing to develop his ineffective assistance of counsel claims, which was denied without prejudice by the motion panel.[3] Defendant also moved to replace his unsigned affidavit attached to his motion to remand with a signed version, which we granted.[4]

## II. ANALYSIS

## A. PREARREST DELAY

Defendant argues that his constitutional rights were violated by a nine-month delay between the felony complaint's issuance and his arrest, and that defense counsel performed ineffectively by failing to move to dismiss for prearrest delay. We disagree.

A challenge to prearrest delay, which implicates due process, is reviewed de novo. *People v Cain*, 238 Mich App 95, 108; 605 NW2d 28 (1999). Because defendant did not raise prearrest delay in the trial court, his claim is reviewed for plain error affecting substantial rights. *People v Woolfolk*, 304 Mich App 450, 454; 848 NW2d 169 (2014). To avoid forfeiture under the plain error rule, a defendant must show (1) that an error occurred; (2) that the error was plain, meaning clear or obvious; and (3) that the error affected their substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish that their substantial rights were affected, a defendant must generally prove that the error caused them "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error

---

[3] *People v Jemison*, unpublished order of the Court of Appeals, entered November 15, 2024 (Docket No. 369879).

[4] *People v Jemison*, unpublished order of the Court of Appeals, entered August 6, 2025 (Docket No. 369879).

seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764.

To establish a claim of ineffective assistance of counsel, a defendant must show that their counsel's performance was deficient and that counsel's deficient performance was prejudicial to their case. *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003), citing *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Defendant preserved his ineffective assistance claim by moving in this Court to remand for a *Ginther*[5] hearing, which the motion panel denied without prejudice. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). When this Court denies a motion for remand, its review of a defendant's ineffective assistance of counsel claim is for errors apparent on the record. *Id.* at 227. Whether a defendant has been denied the effective assistance of counsel is a "mixed question of fact and constitutional law." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004) (quotation marks and citation omitted). Factual findings are reviewed for clear error and questions of constitutional law are reviewed de novo. *Id.*

Generally, mere delay between the issuance of a complaint and an arrest and arraignment, absent actual and substantial prejudice, is not a denial of due process. *Woolfolk*, 304 Mich App at 456. There must be actual and substantial prejudice to the defendant's right to a fair trial and an intent by the prosecution to gain a tactical advantage to constitute reversible error. *People v Crear*, 242 Mich App 158, 166; 618 NW2d 91 (2000), overruled in part on other grounds by *People v Miller*, 482 Mich 540; 759 NW2d 850 (2008). To determine whether prearrest delay requires reversal of a defendant's conviction under due process principles, Michigan courts apply a balancing test that weighs the state's interest in delaying a prosecution with a defendant's interest in timely adjudication of their case. *Cain*, 238 Mich App at 108, citing *People v Bisard*, 114 Mich App 784, 790; 319 NW2d 670 (1982). Under the balancing test, the defendant must first demonstrate actual prejudice, as opposed to mere speculative prejudice, by demonstrating that their ability to defend against the charges was meaningfully impaired such that the disposition of the criminal proceedings was likely affected. *Crear*, 242 Mich App at 166. "A defendant cannot merely speculate generally that any delay resulted in lost memories, witnesses, and evidence," even if the delay was lengthy. *Woolfolk*, 304 Mich App at 454. If a defendant meets their burden to show prejudice, the burden then shifts to the prosecution to persuade the court that the reason for the delay was sufficient to justify any resulting prejudice. *Cain*, 238 Mich App at 109 (citation omitted). In evaluating the prosecution's reason, the court may consider the explanation for the delay, whether the delay was deliberate, and whether undue prejudice occurred. *Id.* (citation omitted).

Defendant has not demonstrated actual and substantial prejudice. As an initial matter, this Court cannot consider defendant's affidavit as direct evidence of prejudice, as it is not part of the lower court record.[6] See *Woolfolk*, 304 Mich App at 454 (explaining that defendant's affidavit on

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] Although this Court granted defendant's request to replace his unsigned affidavit in the motion to remand with a signed copy, the motion did not request, and the order did not purport, to expand

appeal could not be considered to support that prearrest delay caused actual and substantial prejudice). But even if this Court had granted defendant's motion to remand and allowed him to supplement the record with evidence proffered by his affidavit, the affidavit states only that "he believes that had there not been a delay in his arrest, he would have been able to find witnesses to support his alibi defense" and that "he believes that had a motion to dismiss been filed for delay in arrest his case would have been dismissed." Defendant's statements are speculative and nonspecific, as he merely supposes that witnesses would have been identifiable. And as the prosecution points out, defendant's allegation that he would have been able to find alibi witnesses but for the delay in arrest is undermined by his testimony at trial that he spent time with numerous witnesses on the night of the incident, including his fiancée, family, and friends. In other words, defendant managed to identify potential alibi witnesses despite the delay in his arrest.

In *Cain*, the Court concluded that the defendant's argument on prejudice was too speculative when testimony at trial merely demonstrated that some of the witnesses could not provide specific dates for occurrences that they described. *Cain*, 238 Mich App at 109. "[W]ithout allegations that these witnesses forgot specific evidence helpful to [the defendant's] defense," the Court could not conclude that the prearrest delay was prejudicial. *Id.* Similarly here, there is no allegation that specific evidence helpful to defendant's alibi defense was lost. See *id.* Nor does defendant's affidavit "purport to identify any witnesses who would have testified on [defendant's] behalf but for the delay." See *Woolfolk*, 304 Mich App at 455. Because defendant's claim is too speculative, he is not entitled to relief. See *id.* at 454.

Relatedly, because defendant has not shown actual and substantial prejudice, counsel was not ineffective for failing to file a futile motion to dismiss on the basis of prearrest delay. See *id.* at 457. For the same reason, we decline to remand this case for an evidentiary hearing. See *id.*

## B. EVIDENTIARY ERRORS

Defendant raises several arguments to reverse on the basis of evidentiary error.

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). So, generally speaking, the trial court's decision to admit evidence "will not be disturbed unless that decision falls outside the range of principled outcomes." *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019) (quotation marks and citation omitted). However, "[p]reliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Bynum*, 496 Mich at 623. That said, error in the admission of evidence is not a ground for reversal unless refusal to take this action appears "inconsistent with substantial justice." MCR 2.613(A); MCL 769.26; see also *People v Watkins*, 491 Mich 450, 491; 818 NW2d 296 (2012). "[R]eversal is

---

the record to include the affidavit. See *People v Jemison*, unpublished order of the Court of Appeals, entered August 6, 2025 (Docket No. 369879). Thus, the affidavit can be considered only as support for how defendant would expand the record were we to remand for defendant's requested *Ginther* hearing.

required only if the error is prejudicial. The defendant claiming error must show that it is more probable than not that the alleged error affected the outcome of the trial in light of the weight of the properly admitted evidence." *People v McLaughlin*, 258 Mich App 635, 650; 672 NW2d 860 (2003) (citations omitted).

## 1. FEELINGS AND ANXIETIES TESTIMONY

Defendant argues that the trial court erroneously admitted irrelevant testimony concerning Ordiway and Weekley's feelings and anxieties about the shooting and Ordiway's testimony about how the shooting has impacted his life. Although some of the testimony was only minimally relevant and may have been introduced largely to appeal to jurors' sympathy, we conclude that it met the low threshold for relevance under the Michigan Rules of Evidence.

At the time of trial, MRE 401 provided: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence that is relevant is admissible unless prohibited by the United States Constitution, the Michigan Constitution, the Michigan Rules of Evidence, or another rule prescribed by the Michigan Supreme Court. MRE 402. Irrelevant evidence is not admissible. MRE 402.

Evidence is admissible under MRE 401 if it is material and probative. *People v Mills*, 450 Mich 61, 67; 537 NW2d 909 (1995). Materiality is the requirement that the proffered evidence be related to any material fact. *Id.* (quotation marks and citation omitted). "A material fact is one that is in issue in the sense that it is within the range of litigated matters in controversy." *People v Sabin (After Remand)*, 463 Mich 43, 57; 614 NW2d 888 (2000) (quotation marks and citation omitted). "If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial." *Mills*, 450 Mich at 68 (quotation marks and citation omitted). "Relevant evidence thus is evidence that is material (related to any fact that is of consequence to the action) and has probative force (any tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence)." *Sabin*, 463 Mich at 57. Generally, the threshold for relevance under MRE 401 is minimal: *any* tendency to prove a material fact is sufficient. *People v Crawford*, 458 Mich 376, 390; 582 NW2d 785 (1998).

Turning to the present case, after each instance that defense counsel objected on relevance, the prosecutor asserted that the witness's answers went to their credibility. The credibility of the witnesses was material to the action because their testimony formed the basis for the prosecution's case-in-chief. To convict defendant, the jury had to credit the witnesses' testimony that defendant was the shooter.

For that reason, the testimony elicited by the prosecutor's questioning of Weekley regarding her feelings was not irrelevant. When initially asked how she felt, Weekley responded that she felt "overwhelmed" and "anxiety," and then the prosecutor asked "tell me more about anxiety" and asked why Weekley was touching her chest. When the prosecutor asked, "when you woke up at 8:30, help me understand the first thing that you thought about," defense counsel objected on relevance grounds. The prosecutor responded that the impact of the occurrences in the case was relevant to the witnesses' credibility. The trial court overruled the objection and Weekley went on to testify that she thought about court and how the thought of reliving everything

gave her anxiety. Counsel later objected on relevance grounds to the prosecutor's question about what happened when Weekley popped two stress balls. The prosecutor responded that state of mind when recalling the event goes to credibility. In both lines of questioning, Weekley's testimony was relevant to her credibility. Viewed in context, the testimony explained to the jury why Weekley was composing herself in the way that she did on the stand—displaying anxious behaviors that could otherwise be construed by the jury as markers of dishonesty or being high on substances.

Defense counsel also objected on relevance grounds to questions about why Weekley decided to stay at the hospital where Ordiway was being treated for his injuries, to which Weekley had responded, "[a]s soon as I got there I was not going to leave" and explained which family members were present and how long they waited. Weekley then testified that Ordiway was in the hospital for almost a week and that she took care of him after he left the hospital, at which point defense counsel objected again. The prosecutor responded to both objections that Weekley's testimony about Ordiway's injuries, hospitalization, and recuperation period was relevant to witness credibility as well as defendant's intent. It's hard to see how this testimony was relevant to credibility. Whereas some of the previous testimony elicited from Weekley went to explaining her movements and behaviors in court that could bear on her perceived credibility, *why* Weekley stayed at the hospital with Ordiway and who else was there did not help the jury assess her credibility as a fact witness.

As to intent, however, the testimony was slightly relevant in that it spoke to the severity of Ordiway's injury, which in turn can help support a finding of intent to kill. To convict a defendant of AWIM, the prosecution must prove that they committed "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Ericksen*, 288 Mich App 192, 195-96; 793 NW2d 120 (2010) (quotation marks and citation omitted). "Intent to kill may be inferred from all the facts in evidence, including use of a deadly weapon, taking aim at a victim, injury to the victim, evidence of flight and attempts to hide evidence." *People v Everett*, 318 Mich App 511, 531 n 10; 899 NW2d 94, 107 (2017) (quotation marks and citation omitted). And our Supreme Court has stated, notably in an AWIM case, that evidence regarding "[t]he severity and the vastness of [a] victim's injuries [are] of consequence to the determination whether [a] defendant['s] acts were intentional." *Mills*, 450 Mich at 71. The evidence was also somewhat cumulative, as it likely had little additional bearing on intent in light of Weekley's previous testimony that Ordiway was shot at close range through the arm and chest and was rushed to the hospital for treatment, which already tended to prove that the injury was critical. Nonetheless, the evidence was minimally relevant even if cumulative and even if its main purpose appeared to be to evoke sympathy.

We also conclude that Weekley's testimony that she and Ordiway stayed at her parents' house because they were too scared to go home and that she was scared to return home because of defendant and the people he associated with was relevant, even if minimally so, to establish the identity of the shooter. It tends to show that defendant knew where the witnesses lived and frequented the apartment complex to visit other friends, although any person who had shown up at someone's apartment to shoot them would also likely know where the victim lived.

Finally, Ordiway's testimony about how his life changed after the incident, including improvements to his career, education, and sobriety, was relevant to his credibility, especially since

-10-

he admitted that he was a drug user and transacted drugs with defendant at the time of the incident. There is no question that Ordiway's credibility could have been viewed differently by the jury if he said that he was still using drugs at the time of trial.

We pause to note that defendant did not object, nor does he argue on appeal, that the evidence he is challenging was inadmissible under MRE 403. Under that rule, evidence that is relevant under MRE 401 may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "Unfair prejudice" means that "there exists a danger that marginally probative evidence will be given undue or pre-emptive weight by the jury" that is "out of proportion to its logically damaging effect" and "it would be inequitable to allow the proponent of the evidence to use it." *Mills*, 450 Mich at 75 (citation omitted). Some of the evidence in question may well have been unfairly prejudicial because the witnesses' feelings about the incident mainly evoke sympathy. Arguably, this testimony about the emotional impact of a serious crime had the potential to distract the jury from the determinative issue in the case—the identity of the shooter. And the evidence about the seriousness of the injury, which minimally goes to intent to kill, may have been needlessly cumulative when Weekley had already testified that Ordiway was shot in the chest at close range and taken to the hospital. Had this evidence been objected to under MRE 403, the trial court would have been required to weigh these considerations against the probative value of the evidence. But, again, defendant did not make an MRE 403 argument in the trial court and does not advance one on appeal, so we confine our analysis to the issue of relevance under MRE 401. And, to summarize, we conclude that the challenged evidence meets the low threshold for relevance under MRE 401.

## 2. OTHER-ACTS EVIDENCE

Defendant argues the trial court abused its discretion by allowing the prosecutor to admit prejudicial other-acts evidence. We agree that the trial court erred by admitting this evidence. However, because we are unpersuaded that the error affected the outcome of the trial, we conclude that the error does not warrant reversal.

MRE 404(b)(1) governs the admissibility of prior bad-acts evidence and provided at the time of trial:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"Relevant other acts evidence does not violate Rule 404(b) unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith." *People v VanderVliet*, 444 Mich 52, 65; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). Put differently, "[e]vidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even*

-11-

*if* it also reflects on a defendant's character." *People v Mardlin*, 487 Mich 609, 615; 790 NW2d 607 (2010). But evidence that is otherwise admissible must still be excluded if the probative value of the evidence is substantially outweighed by a danger of unfair prejudice to the defendant. MRE 403. "Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test . . . ." *Mardlin*, 487 Mich at 617.

Defendant points to his testimony elicited by the prosecutor on cross-examination:

Q. Okay. You also indicated that you had no idea about any of the matters having to do with being a rat or having to do with drugs; correct?

A. That's correct.

Q. Okay. But, in fact, you've been involved with rats before; correct?

A. I guess.

Q. And taking care of rats?

A. No. Like I'm a hit man? I'm not taking care of rats.

Q. October 14 of 2023, you made a call to a friend and it was recorded. Is that fair to say?

A. Yes.

Q. In that call you indicated, "Hell, yeah. We had to take an N-word out. He was a rat. That N-word done told on Rico"?

A. No. I didn't take nobody out.

Q. Did you say that, sir?

A. That was jail matters.

Defense counsel objected on the ground that the evidence was improper impeachment that was more prejudicial than probative because there was no connection between defendant and the allegations in the call. Counsel also argued that there was a danger of the jury misconstruing the information as an "other act" in which defendant was not involved and was never charged for, and put defendant in the impossible position of having to deny something completely unrelated to him.

The trial court explained that the problem was that "[defendant], instead of answering whether he made the statement[,] answered whether he committed the act, whether he was involved specifically in taking another person out." Although the prosecution suggested that defendant may have been talking about Ordiway on the call, the trial court rejected the use of the testimony as substantive evidence of an admission. The prosecutor argued in the alternative that the statement she sought to impeach defendant with went directly to him saying that "he has nothing to do with

-12-

these types of interactions." But in fact, no testimony to that effect had been previously elicited. Instead, during direct examination, defendant had denied that he knew before the incident that Weekley and Ordiway were informants. Ultimately, the trial court only allowed the statement to come in to impeach defendant if he denied saying the things recorded in the call. MRE 613 allows extrinsic impeachment of a prior statement. After the objection was overruled, the prosecutor asked, before moving on to other areas of questioning:

> Q. Mr. Jemison, isn't it true you indicated on the call that we were just previously speaking about, "Hell, yeah, we had to take an N-word out. He was a rat. That N-word done told on Rico"?
>
> A. Yes.

We conclude that the trial court erred in admitting this jail call evidence to impeach defendant's prior statement. In his earlier testimony on direct examination, defendant had simply denied that he knew that Weekley and Ordiway were working with the police. Contrary to the suggestion by the prosecution, defendant did not testify that he was uninvolved in drugs or had no knowledge of snitches generally; rather, he denied knowing that Ordiway and Weekley specifically were informants. The phone call and elicited testimony did not undermine those statements. Instead, the testimony went toward showing that defendant acted in conformity with his character in that he had previously had dealings with snitches. The quoted portion of the call suggested (without context) that defendant was involved with targeting an informant. Moreover, the danger of unfair prejudice substantially outweighed the probative value of the evidence, as the jury could infer that defendant was referring to Ordiway or had killed other "rat[s]." See MRE 403. Therefore, admitting the evidence was an abuse of discretion.

Having determined that the evidence should not have been admitted, we turn to the question of whether the evidence was so prejudicial that, more probably than not, its admission undermined the reliability of the verdict. See *Denson*, 500 Mich at 396. To answer it, we must examine the error "in light of the weight of the properly admitted evidence." *McLaughlin*, 258 Mich App at 650.

Overall, the properly admitted evidence against defendant was strong. Identification was the determinative issue at trial, and both Weekley and Ordiway consistently identified defendant, whom they knew, as the shooter. Although defense counsel exploited some relatively minor inconsistencies in their testimony to support the defense theory of misidentification, the eyewitnesses' identification of defendant did not waiver. Defendant testified inconsistently about his alibi, as he stated to his fiancée in a call that he was at the house all day, but testified that he went to his brother's fiancée's family's house and later out to a bar with his uncle. Defendant did not have any alibi witnesses testify on his behalf, despite naming several people with whom he claimed he spent time that night. There was also strong evidence regarding defendant's motive; Ordiway and Weekley were police informants, and although defendant denied knowing this, there was testimony that defendant had been telling people that he knew. Ordiway testified that he had sent text messages to defendant with the purpose of keeping him away in the day or so leading up to the shooting, and defendant admitted to receiving the messages.

-13-

Compared to the strength of the properly admitted evidence, we are not persuaded that the error in admitting the jail call was significant enough to affect the outcome of the trial. The call in question was not played for the jury; the prosecutor merely read out a portion of it during defendant's cross-examination. On redirect examination, defendant explained that he was talking about something that he was not involved in, but involved a guy who "ratted on" others and "got jumped," indicating that it was just "street talk" with his fiancée. And the prosecutor did not reference the jail call in closing arguments. Ultimately, had the jail call evidence not been admitted, the jury would still have been presented with strong evidence that defendant shot Ordiway, and little by way of plausible explanation for why or how the eyewitnesses misidentified him as the shooter. After reviewing the evidence as a whole—and given that the evidence strongly supported defendant's guilt, the testimony was relatively brief, and was not explicitly referenced in closing—we cannot conclude that the error was outcome-determinative. See *Denson*, 500 Mich at 396. Therefore, although defendant is correct that the evidence was improperly admitted, he is not entitled to relief.

## C. PROSECUTORIAL MISCONDUCT

Defendant makes several arguments that the prosecutor committed misconduct.

We review de novo claims of prosecutorial misconduct to determine whether a defendant was denied a fair and impartial trial. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003). Because defendant did not object to any of the alleged prosecutorial misconduct and, when appropriate, request a curative instruction, his claims are reviewed for plain error. See *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 14 (citation omitted). To avoid forfeiture under the plain error rule, a defendant must show (1) that an error occurred; (2) that the error was plain error; and (3) that the error affected his substantial rights. *Carines*, 460 Mich at 763. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764. This Court "will not find error requiring reversal if a curative instruction could have alleviated the effect of the prosecutor's misconduct." *Serges*, ___ Mich App at ___; slip op at 14 (citation omitted).

Defendant preserved his ineffective assistance of counsel claims by moving in this Court for a remand for a *Ginther* hearing, which the motion panel denied without prejudice. See *Abcumby-Blair*, 335 Mich App at 227. When this Court denies a motion for remand, its review of a defendant's ineffective assistance of counsel claim is for errors apparent on the record. *Id.* at 227.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "A defendant's right to a fair trial may be violated when the prosecutor interjects issues broader than the guilt or innocence of the accused." *People v Rice (On Remand)*, 235 Mich App 429, 438; 597 NW2d 843 (1999). But evidence properly introduced cannot form the basis for prosecutorial misconduct. See *id.* And "a finding of prosecutorial misconduct may not be based on a prosecutor's good-faith effort to admit evidence." *People v Abraham*, 256 Mich App 265, 278; 662 NW2d 836 (2003). Prosecutorial misconduct issues "are considered on a case-by-case basis, and this Court must examine the entire

record and evaluate a prosecutor's remarks in context." *Dobek*, 274 Mich App at 64. The prosecutor generally has great latitude in relation to their arguments and conduct, and may argue the evidence and reasonable inferences arising from the evidence in support of their theory of the case. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). But a prosecutor "cannot vouch for the credibility of [their] witnesses to the effect that [they have] some special knowledge concerning a witness's truthfulness." *Id.* at 276.

## 1. FAILURE TO INVESTIGATE

Defendant argues that he was denied due process by the failure of law enforcement to conduct a complete investigation. We disagree.

"The government is held responsible for evidence within its control, even evidence unknown to the prosecution." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). While there is a due process right to obtain potentially exculpatory evidence, this right is not violated unless a defendant can show bad faith on behalf of the government. *People v Anstey*, 476 Mich 436, 460-461; 719 NW2d 579 (2006), citing *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988). "For due process purposes, there is a crucial distinction between failing to disclose evidence that has been developed and failing to develop evidence in the first instance." *Anstey*, 476 Mich at 461. Neither the prosecutor nor the police have a constitutional duty to help defendants *develop* potentially exculpatory evidence. *Id.* See also *People v Sawyer*, 222 Mich App 1, 6; 564 NW2d 62 (1997) (noting that "police are not required to seek and find [exculpatory evidence]").

Defendant asserts that he was effectively denied a fair trial because police failed to seek out evidence that could have assisted his defense, but this is not required by the right to due process. See *Anstey*, 476 Mich at 461; *Sawyer*, 222 Mich App at 6. Defendant compares his case to *People v Jordan*, 23 Mich App 375, 388; 178 NW2d 659 (1969), in which the Court reversed when the prosecutor failed to obtain evidence and violated the prosecutor's duty "to take care that the innocent should be protected." (Quotation marks and citation omitted.) But this comparison is inapt. There, the complainant in a criminal sexual conduct case had testified that the defendant had wiped semen off her body with a white handkerchief with blue stripes, and a handkerchief matching that description was found on defendant's person after his arrest and introduced into evidence over the defense's objection. *Id.* at 377, 385. The handkerchief was shown to the jury with dried stains, but was not chemically tested for semen until after the trial, when it was found not to contain semen. *Id.* at 386-387. The Court held that the evidence was improperly admitted as it lacked foundation grounded in the failure to test the evidence, and its admission was highly prejudicial such that reversal was warranted. *Id.* at 389. But in addition to being quite factually distinct, the holding in *Jordan* was premised on the conclusion that the prosecution failed to lay a proper foundation when admitting evidence. *Id.* The evidence that the prosecutor admitted was highly prejudicial because of the failure to investigate it. *Id.* Here, defendant is not claiming that the prosecution's evidence was erroneously admitted without adequate investigation, but that police failed to generally investigate his case. And while the police in *Jordan* had control over the evidence, but had failed to test it, here, defendant laments the failure to acquire evidence in the first place. See *id.*

An additional problem with this comparison, and with defendant's claim overall, is that defendant provides no factual support for his claim. A defendant may not leave it to this Court to find a factual basis to support or reject their claim. *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) (citation omitted). Defendant asserts, without pointing to the record, that police failed to interview neighbors. And while defendant also faults police for failing to pursue other suspects after they had zeroed in on him following interviews with the eyewitnesses, police need not seek out exculpatory evidence. *Sawyer*, 222 Mich App at 6. In addition, defendant's basis for prejudice is speculative. Defendant merely asserts that significant potentially exculpatory evidence was lost without specification. In comparison, in *Jordan*, defendant had obtained an exculpatory test result from the item that police had failed to test. *Jordan*, 23 Mich App at 386-387.

Finally, on this record, the police did not act unreasonably in their investigation such that defendant was deprived of a fair trial. Police interviewed witnesses Ordiway and Weekley at the scene and the hospital. They developed a description of the shooter premised on the witness interviews and used law enforcement tools to identify a suspect. They also conducted separate photographic lineups using standard procedures with each witness. No other suspects came up during the investigation and police did not recover any bullet casings from the scene. That the police did not identify other leads does not mean that the investigation was inadequate. Defendant has not demonstrated plain error requiring reversal.

## 2. FEELINGS AND ANXIETIES TESTIMONY

Defendant asserts as prosecutorial error the testimony elicited concerning Ordiway's and Weekley's feelings and anxieties. We disagree.

"A prosecutor may not appeal to the jury to sympathize with the victim." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). As discussed above, some of the testimony was only minimally relevant. Additional testimony that defense counsel did not object to included the prosecutor's question to Ordiway regarding the second time the door was opened after the shooting: "Tell me more about being nervous" that Weekley went outside, to which Ordiway responded, "I just didn't know where [defendant] was at, and so I didn't want her to go out there." This testimony is relevant to intent to kill, in that Ordiway believed that defendant might return. Although its relevance was slight and it also helped evoke sympathy, as discussed above, the testimony relating to feelings and anxieties was relevant, and there was no outcome-determinative error meriting reversal. See *McLaughlin*, 258 Mich App at 650.

## 3. DENIGRATION OF DEFENSE COUNSEL

Defendant argues that the prosecutor denigrated defense counsel in her closing arguments as follows:

> Now, [defense counsel] is a very experienced attorney. You had an opportunity to see this for yourselves and how he can question the witnesses and how he conducted his case. But he is trying to make your job more difficult.

-16-

During opening statements he told you this case was about mistaken identity, that there are serious questions about the identification of his client as the person who committed these crimes and that the witnesses were simply mistaken.

There is an old saying in the law. If the facts are against you, you argue the law.

If the law is against you, you argue the facts. But if they are both against you, you create diversions.

Ladies and gentlemen, that is what the defense is in this case. It's a diversion to get your eye off the ball.

Defendant also takes issue with the prosecutor referring to the defense as "smoke and mirrors." We agree that these comments were inappropriate, but reversal is unwarranted.

A prosecutor may not personally attack a defense attorney, *McLaughlin*, 258 Mich App at 646, or argue that counsel was intentionally trying to mislead the jury, *Unger*, 278 Mich App at 236. But a prosecutor may attack the credibility of a defense theory. *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005). This Court has found improper a prosecutor's remarks in closing that defense counsel had attempted to confuse the issues, mislead the jury using red herrings and smoke and mirrors, and deter the jury from the real issues in the case. *Unger*, 278 Mich App at 238. Cf. *People v Rodriguez*, 251 Mich App 10, 40; 650 NW2d 96 (2002) (holding that a prosecutor's statement during closing argument that defense counsel's argument is "smoke and mirrors" did not amount to prosecutorial misconduct). The prosecutor's comments here that the defense was "creat[ing] diversions" and amounted to "smoke and mirrors" suggested that "defense counsel was trying to distract the jury from the truth." *Unger*, 278 Mich App at 238. The remarks therefore strayed from being a proper commentary on the defense strategy and were erroneous.

That said, there is no reversible error because had defense counsel timely objected, "a curative instruction could have alleviated the effect of the prosecutor's misconduct." See *Serges*, ___ Mich App at ___; slip op at 14 (citation omitted). The prosecutor's remarks were not so extreme or flagrant that a curative instruction would have been ineffective, see *People v Flanagan*, 129 Mich App 786, 796; 342 NW2d 609 (1983), nor was defendant deprived of a fair trial when any possible prejudice was minimal. See *Dobek*, 274 Mich App at 63; *Serges*, ___ Mich at ___; slip op at 15. Further, because the error was not outcome-determinative, defendant does not prevail on his related ineffective assistance claim. See *Riley*, 468 Mich at 140. And because there was no prejudice, this Court need not revisit defendant's motion to remand to allow him to develop his ineffective assistance claim. See *id.*

## 4. VOUCHING

Defendant argues that the prosecutor vouched for the credibility of her witnesses in her closing argument when stating:

Ryan and Juliet's stories have never changed about Pooh. Their accounts are consistent. They have no motive to be dishonest about what happened on that night on August 20th of 2021.

Defendant also takes issue with the prosecutor stating in rebuttal that "the only person that had any reason to shoot Ryan was this person right here." We disagree.

Although defendant argues that the prosecutor impermissibly stated the witnesses had no motive to lie, this was a proper commentary on the evidence. A prosecutor "cannot vouch for the credibility of [their] witnesses to the effect that [they have] some special knowledge concerning a witness's truthfulness." *Bahoda*, 448 Mich at 276. But they "may comment their own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004), citing *Flanagan*, 129 Mich App at 796.

The prosecution did just that by fairly commenting on the consistency of the witnesses' accounts and their lack of motive to lie, which was supported by the record. In defendant's view, the evidence supported that the witnesses had motive to lie, but there was also evidence that the witnesses lacked a motive to wrongly implicate defendant—for example, they both testified that they received no benefits for their testimony. Likewise, much of the evidence supported the prosecution's argument that Weekley and Ordiway consistently identified defendant, including on the 911 call, to a responding officer, to the investigating detective, and at trial. And some of the evidence supported the argument that defendant had a motive to shoot Ordiway, such as the text messages in the days leading up to the shooting. Further, defense counsel's questions that sought to undermine the credibility and consistency of the witness accounts, pressing on, for example, whether Ordiway was smoking a cigarette and wearing glasses, opened the door to the prosecution's closing argument. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Therefore, the prosecutor did not erroneously vouch for the witnesses' credibility. Likewise, counsel was not ineffective for failing to make a meritless objection. See *id.* Nor do we find it necessary to revisit defendant's motion to remand when an objection would not have succeeded. See *id.*

## D. ADDICT-INFORMER JURY INSTRUCTION

Defendant argues that his request for an addict-informer jury instruction as to Ordiway was erroneously denied, and that trial counsel performed ineffectively by failing to request the instruction as to Weekley. On both counts, we disagree.

Claims of instructional error are reviewed de novo. *People v Spaulding*, 332 Mich App 638, 652; 957 NW2d 843 (2020). We review for an abuse of discretion the trial court's determination that an instruction applies to the facts of the case. *Dobek*, 274 Mich App at 82. The trial court abuses its discretion when its decision "falls outside the range of reasonable and principled outcomes" or when the court "makes an error of law." *People v Christian*, 510 Mich 52, 75; 987 NW2d 29 (2022) (quotation marks and citation omitted).

When this Court denies a motion for remand, its review of a defendant's ineffective assistance of counsel claim is for errors apparent on the record. *Abcumby-Blair*, 335 Mich App

at 227. Whether a defendant has been denied the effective assistance of counsel is a "mixed question of fact and constitutional law." *Matuszak*, 263 Mich App at 48 (quotation marks and citation omitted). Factual findings are reviewed for clear error and questions of constitutional law are reviewed de novo. *Id.*

"[E]ven if somewhat imperfect, instructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights." *Spaulding*, 332 Mich App at 653 (quotation marks and citation omitted). "The defendant bears the burden of establishing that the asserted instructional error resulted in a miscarriage of justice." *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010), citing MCL 769.26. "Jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury." *Dobek*, 274 Mich App at 82. An appellate court may not reverse a criminal conviction "on the ground of misdirection of the jury" unless "after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26. An error results in a miscarriage of justice when the defendant can show that, but for the error, it is more probable than not that the outcome would have been different. *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

M Crim JI 5.7 provides a cautionary instruction to the jury for witnesses "who [have] given information to the police in this case" and are addicted to a specified drug. The instruction admonishes the jury to think carefully about whether the witness's testimony is supported by other evidence, whether the witness's drug addiction affects their ability to testify, whether the witness has been promised a benefit concerning a possible prosecution against themselves, and whether the witness had a motive to testify falsely. *Id.* "An instruction concerning special scrutiny of the testimony of addict-informants should be given upon request, where the testimony of the informant is the only evidence linking the defendant to the offense." *People v Griffin*, 235 Mich App 27, 40; 597 NW2d 176 (1999), overruled in part on other grounds *People v Thompson*, 477 Mich 146, 148; 730 NW2d 708 (2007) (citation omitted); see also Use Note, M Crim JI 5.7.

1. ORDIWAY

As to whether Ordiway qualifies as an "addict-informer," the record reflects that Ordiway was providing information to the police about drug and gun transactions. The evidence also reflects that Ordiway was using drugs at the time of the incident, as he testified that he used heroin, opiate pills, and cocaine and he tested positive for cocaine and benzodiazepines at the hospital. In *Griffin*, this Court found that evidence that the informant had been arrested twice for selling drugs, that he once used illicit drugs four or five times a week, but that he was not using drugs at the time of trial, and that he previously had a crack cocaine habit for five years, was insufficient to demonstrate that the witness was an addict for purposes of the instruction. *Griffin*, 235 Mich App at 40. Here, there was no testimony about the frequency of Ordiway's drug use and he testified that he was sober at the time of trial. As in *Griffin*, therefore, there was insufficient evidence to support defendant's request for the instruction. See *id.*

Even if Ordiway qualified as an "addict-informer," the next question is whether the instruction applies here, when defendant was not the target of information that Ordiway provided to the police in his role as an informant. The instruction itself provides that the witness "has given

-19-

information to the police in this case." M Crim JI 5.7. Accordingly, the jury instruction appears to be concerned with witnesses who—in their role as an informant—provide information to the police about the defendant which relates to the charged offenses. But the case against defendant did not concern drug or gun transactions, but defendant's role in shooting Ordiway. As the trial court observed, the fact that Ordiway provided information to the police about being shot by defendant, separately from his role as a confidential informant, does not appear to align with the intended use of the instruction. Nor was Ordiway's testimony the only supporting evidence linking defendant to the crime, as Weekley also testified as an eyewitness. See *Griffin*, 235 Mich App at 40. Thus, the trial court did not abuse its discretion by declining to issue the requested instruction. See *Dobek*, 274 Mich App at 82.

## 2. WEEKLEY

As for whether counsel performed ineffectively for failing to request the instruction as to Weekley, there was no testimony that she was addicted to drugs, and she denied using any substances that night. "[F]ailure to request a jury instruction may constitute an unreasonably deficient level of performance." *People v Yeager*, 511 Mich 478, 490; 999 NW2d 490 (2024). But "[t]rial counsel's failure to request an instruction inapplicable to the facts at bar does not constitute ineffective assistance of counsel." *People v Truong*, 218 Mich App 325, 341; 553 NW2d 692 (1996). Accordingly, defense counsel did not perform ineffectively for failing to request the instruction as to Weekley because she did not qualify as an "addict-informer" under the instruction. See *Griffin*, 235 Mich App at 40. Correspondingly, we decline to revisit defendant's request to remand for a *Ginther* hearing to develop his ineffective assistance claim because requesting the instruction would have been futile. See *id.*

## E. CUMULATIVE ERROR

Defendant argues that he was denied a fair trial on the basis of cumulative error. We disagree.

This Court reviews an argument for cumulative error to determine whether the combination of alleged errors denied a defendant a fair trial. *People v Knapp*, 244 Mich App 361, 387-388; 624 NW2d 227 (2001). "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. If there are no errors, there can be no cumulative effect of errors meriting reversal. *Id.*

As discussed, there were errors that, standing alone, do not support reversal. The other-acts evidence of the jail call was admitted in error. The prosecutor erred by making comments in closing that denigrated defense counsel. In other instances, the prosecutor elicited testimony about Weekley and Ordiway's feelings and anxieties, which was relevant, but only minimally so, and had the potential to be unfairly prejudicial because it chiefly elicited sympathy and distracted from the critical issue of the shooter's identity. Although defense counsel did not object on MRE 403 grounds (or make that argument here), we consider the prejudicial effect of this testimony as part of a cumulative error analysis. But given the strong evidence against defendant—including consistent eyewitness identification and a conflict between him and Ordiway, coupled with a shaky

alibi—and the minimal impact of the errors, reversal is unwarranted.  See *Dobek*, 274 Mich App at 106.

## F.  OV SCORING

Turning to sentencing, defendant argues that OV 4, OV 5, OV 6, and OV 19 were improperly scored.  We agree that OV 4 was improperly scored, but defendant's other arguments lack merit, and the OV 4 error alone does not entitle him to resentencing.

This Court reviews the trial court's findings supporting an assessment of points under the sentencing guidelines for clear error, and a preponderance of the evidence must support the factual findings.  *People v Baskerville*, 333 Mich App 276, 291; 963 NW2d 620 (2020).  "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo."  *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).  "When interpreting a statute, all undefined 'words and phrases shall be construed and understood according to the common and approved usage of the language[.]' "  *People v Laidler*, 491 Mich 339, 347; 817 NW2d 517 (2012), citing MCL 8.3a.  "Offense variables must be scored giving consideration to the sentencing offense alone, unless otherwise provided in the particular variable."  *People v Teike*, 348 Mich App 520, 526; 19 NW3d 733 (2023) (quotation marks and citation omitted).  "When calculating sentencing guidelines, the trial court may consider all record evidence, including the presentence investigation report (PSIR), plea admissions, and testimony.  The trial court may also consider victim-impact statements, and may make reasonable inferences from evidence in the record."  *Id.* at 526-527 (quotation marks and citation omitted).

If a defendant's sentence is based on an inaccurate calculation of their guidelines range, they are entitled to be resentenced.  *People v Francisco*, 474 Mich 82, 92; 711 NW2d 44 (2006).  By contrast, "[w]here a scoring error does not alter the appropriate guidelines range, resentencing is not required."  *Id.* at 89 n 8.  Here, defendant's OV score of 150 and PRV score of 80 placed him in cell VI-F, which translates to the highest possible minimum-sentence range for a Class A offense—270-450 months.  See MCL 777.62.  To change his applicable guidelines range and be entitled to resentencing, defendant must successfully appeal 51 points.  See *id.*  Defendant must therefore successfully appeal his 50-point score on OV 6, in combination with at least one other variable, to prevail.

### 1.  OV 6

Defendant argues that OV 6 should have been scored at zero.  We disagree.

OV 6 is properly scored at 50 points in circumstances including where "[t]he offender had premeditated intent to kill," and can be scored for the crime of assault with intent to commit murder.  MCL 777.36(1)(a); MCL 777.22.  "The sentencing judge shall score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury."  MCL 777.36(2)(a).  Premeditation is not an element of AWIM, which requires "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder."  *People v Brown*, 267 Mich App 141, 147-148; 703 NW2d 230 (2005) (cleaned up).  "Premeditated intent" is not defined in the statute, but when reviewing OV 6, this Court has looked to caselaw concerning

the requisite premeditation for a conviction for first-degree murder. See *People v Steanhouse*, 313 Mich App 1, 40; 880 NW2d 292 (2015), citing *People v Plummer*, 229 Mich App 293, 300-301; 581 NW2d 753 (1998). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem . . . . [P]remeditation and deliberation characterize a thought process undisturbed by hot blood." *Plummer*, 229 Mich App at 300 (citation omitted). "Though not exclusive, factors that may be considered to establish premeditation include: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the [crime] itself, including the weapon used and the location of the wounds inflicted." *Id.*

Here, the evidence reflects that after receiving threatening text messages from Ordiway, defendant brought a gun to Ordiway's apartment complex, where he did not reside, and knocked on the door, asking for Ordiway when Weekley answered. When Ordiway appeared at the door, defendant shot at him. There were multiple points at which defendant could have changed his course of action, given that he traveled to the apartment complex, to Ordiway's apartment, and waited for Ordiway to come to the door. The evidence supports a finding that he had time to think and plan before committing the act. *See id.* And under these facts, a reasonable inference is that defendant planned the attack in advance. See *Steanhouse*, 313 Mich App at 41 (reasoning that "one could reasonably infer that defendant planned the attack before it occurred and was lying in wait to attack [the complainant] when he returned to the basement"). Accordingly, the trial court did not clearly err in finding by a preponderance of the evidence that defendant had a premeditated intent to kill.

Because defendant does not succeed on his argument as to OV 6, his guidelines range does not change and resentencing is not required on the basis of any guidelines scoring error. See *Francisco*, 474 Mich at 89 n 8. Even so, in the interest of thoroughly reviewing defendant's claims, we evaluate his other OV challenges.

2. OV 4

Defendant also argues that OV 4 was improperly scored. We agree.

MCL 777.34(1)(a) allows for OV 4 to be scored at 10 points if "[s]erious psychological injury requiring professional treatment occurred to a victim." The trial court may "[s]core 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." MCL 777.34(2). The trial court may assess 10 points for OV 4 if the victim suffers, among other possible psychological effects, personality changes, anger, fright, or feelings of being hurt, unsafe, or violated. *People v Gibbs*, 299 Mich App 473, 493; 830 NW2d 821 (2013). However, evidence of fear while a crime is being committed is, standing alone, insufficient to assess points for OV 4. *People v White*, 501 Mich 160, 162; 905 NW2d 228 (2017). Similarly, OV 4 cannot be scored on the assumption that people typically suffer psychological injury when they are victims of the offense type in question. *Id.* at 163.

Here, Ordiway testified at trial that immediately after the incident, he was afraid that he would die, and he did not return directly to his home after being discharged from the hospital for fear that defendant would return to kill him and Weekley. However, the "Victim's Impact

Statement" portion of the PSIR shows that Ordiway "did not seek mental health therapy and stated he is doing well." Ordiway also testified that since the shooting, he made changes to his life including becoming sober, changing his career, and continuing his education.

These facts are insufficient to satisfy the scoring conditions of "serious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). While fear may form the basis to score OV 4, an expression of fear directly in the aftermath of a criminal incident, without more, is insufficient. And "[w]hile crime victims are often obviously, and understandably, frightened when a crime is being perpetrated, this fear does not necessarily result in a 'serious psychological injury.' " *White*, 501 Mich at 164-165, quoting MCL 777.34(1)(a). Ordiway's own statement that he was doing well mentally around the time of sentencing and that he did not require counseling cuts directly against scoring points for this variable. His improved lifestyle after the incident also undermines any inference that he suffered a serious psychological injury. To uphold the score would be dangerously close to a presumption, effectively rejected by the Supreme Court in *White*, that OV 4 should be scored 10 points for every serious crime when the victim is frightened. See *White*, 501 Mich at 164-165. Consequently, we hold that the trial court clearly erred by scoring OV 4 at 10 points.[7] But this error is harmless because correction of the error would not change defendant's guidelines range, so he is not entitled to resentencing. See *Francisco*, 474 Mich at 89 n 8.

### 3. OV 5

Defendant argues that OV 5, which was scored 15 points on the basis of psychological injury to Weekley, should be scored at zero. We disagree.

OV 5 is properly scored in cases where serious psychological injury requiring professional treatment occurred to a member of a victim's family. MCL 777.35(1)(a). It can be scored for a conviction for assault with intent to commit murder. MCL 777.22(1). Our Supreme Court has held that the term "serious" in "serious psychological injury" means "having important or dangerous possible consequences." *People v Calloway*, 500 Mich 180, 186; 895 NW2d 165 (2017). "In scoring OV 5, a trial court should consider the severity of the injury and the consequences that flow from it, including how the injury has manifested itself before sentencing and is likely to do so in the future, and whether professional treatment has been sought or received." *Id.* at 186.

As the prosecution points out, defendant did not dispute the familial relationship between the victim and Weekley. We therefore assume for purposes of the analysis that Weekley was a member of Ordiway's family within the meaning of the statute. See MCL 777.35(1). Even absent this assumption, it is reasonable in this context to consider Weekley a "member of a victim's family," *id.*, as Ordiway was her boyfriend and she had resided with him for about five years at the time of trial.

---

[7] At sentencing, the prosecutor argued in the alternative that OV 4 could be scored 10 points as to Weekley. We need not address this argument, as neither party raised it on appeal and it is not evident that the trial court relied upon it.

-23-

The trial court did not clearly err in finding that by a preponderance of evidence that Weekley suffered a "[s]erious psychological injury requiring professional treatment." See MCL 777.35(1)(a). At trial, Weekley explained that she was anxious and overwhelmed, popping two stress balls during her testimony. Weekley repeatedly used the term "traumatized" to describe her current and past states of being, testifying that watching Ordiway get shot was "very traumatizing" and "very hard." Speaking of her fear about returning home from the hospital, she stated, "I'm traumatized." She further testified that seeing defendant in court caused her fear, anxiety, and was traumatizing. After reiterating that "this has been traumatizing," Weekley requested a break during cross-examination. And at sentencing, Ordiway stated that Weekley "still suffers from the trauma of this . . . . She's still in counseling over it." Given Weekley's testimony at trial, Ordiway's statement at sentencing, and reasonable inferences that may be drawn from them, a preponderance of the evidence supported the trial court's finding that Weekley suffered "[s]erious psychological injury requiring professional treatment." See MCL 777.35(1)(a). Accordingly, the trial court did not err by assessing 15 points for OV 5.

### 4. OV 19

Defendant argues that OV 19 was incorrectly scored. We disagree.

Ten points may be assessed under OV 19 if "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice, or directly or indirectly violated a personal protection order." MCL 777.49(c). "A defendant interferes with the administration of justice by 'oppos[ing] so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process.' " *Baskerville*, 333 Mich App at 301, citing *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013). "In scoring OV 19, a court may consider the defendant's conduct after the completion of the sentencing offense." *Baskerville*, 333 Mich App at 301, citing *People v Smith*, 488 Mich 193, 200; 793 NW2d 666 (2010).

The trial court rejected defendant's challenge to OV 19, stating that the jail call to defendant's fiancée "did indicate some attempt to convince witnesses to testify in a certain way conforming with Mr. Jemison's narrative of what happened . . . ." The portions of the jail call read into the record suggested that defendant disagreed with and was extremely frustrated with his fiancée's recollection, but defendant did not threaten her or tell her what to say. But even setting aside the jail call, defendant's PSIR states that defendant provided police a false name when, after the crime, he was a passenger in a vehicle subject to a traffic stop. That the PSIR states that defendant gave police a fake identity to avoid detection after the crime is sufficient to find that defendant "otherwise interfered with or attempted to interfere with the administration of justice." See MCL 777.49(c); see also *Baskerville*, 333 Mich App at 301. The trial court therefore did not err in scoring OV 19 at 10 points.

### G. PROPORTIONALITY OF SENTENCE

Finally, defendant disputes the proportionality of his sentence. We disagree that defendant's sentence was disproportionate.

"[D]efendants may challenge the proportionality of any sentence on appeal and [] the sentence is to be reviewed for reasonableness." *People v Posey*, 512 Mich 317, 360; 1 NW3d 101

(2023). Challenges to the proportionality of a sentence are reviewed for abuse of discretion. *Id.* at 325; *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). "A trial court abuses its discretion if the imposed sentence is not 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Ventour*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363922); slip op at 7, quoting *Steanhouse*, 500 Mich at 459-460.

Defendant's controlling sentence of 30 to 60 years for AWIM is within the guidelines range of a minimum sentence of 22.5 to 37.5 years (270 to 450 months). In fact, the 30-year minimum sentence falls at the exact midpoint of the guidelines. A within-guidelines sentence is presumptively proportionate, but that presumption may be overcome. *Posey*, 512 Mich at 360. To rebut this presumption, a defendant must present "unusual circumstances that would render the presumptively proportionate sentence disproportionate." *Ventour*, __ Mich App at ___; slip op at 8 (quotation marks and citation omitted). Unusual circumstances are uncommon or rare. *Id.*

Defendant argues that his sentence is not proportionate, citing mitigating factors including that he was 50 years old at sentencing and effectively received a life sentence. Defendant also cites his health issues. But these factors are not particularly unusual. See *Ventour*, __ Mich App at ___; slip op at 8. And, "a defendant's age is insufficient to overcome the presumption of proportionality, especially when considered in light of a defendant's criminal record and the gravity of his offenses." *People v Purdle*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 4.

Here, defendant has a significant and decades-long criminal record. Defendant previously served time in state prison for assault with intent to commit great bodily harm. He also served significant time in federal prison for bank robbery, where he violated parole and was sent back to prison twice. Defendant has also been convicted of operating while impaired and delivery/manufacture of controlled substances less than 50 grams. As for the seriousness of the instant crime, it was grave. Following an argument over text, defendant sought out the complainant, his friend, in his home and then shot him through the arm and chest in front of the complainant's girlfriend, who was also placed at risk by the gunshot.

Defendant's argument that his guidelines range is excessively wide is more appropriately directed to the Legislature or the newly reestablished Michigan sentencing commission. See MCL 769.34a. And although defendant argues that the goals of rehabilitation and deterrence are not served by his sentence, the goals of sentencing also include the protection of society and punishment of the offender, and we are not persuaded that the trial court did not appropriately balance those factors. See *People v Sabin*, 242 Mich App 656, 661-662; 620 NW2d 19 (2000).

In sum, defendant has not rebutted the presumption that his midpoint within-guidelines sentence was proportionate to the offense and the offender, and he is therefore not entitled to resentencing. See *Ventour*, __ Mich App at ___; slip op at 8.

III. CONCLUSION

Defendant has not shown actual and substantial prejudice from the nine-month delay in his arrest nor was counsel ineffective for failing to move to dismiss on that basis. The testimony elicited by the prosecutor about the eyewitnesses' anxieties and feelings satisfied the low threshold

for relevance under MRE 401. Although the trial court erroneously admitted other-acts evidence, its inclusion was not outcome-determinative. Because there is no duty for police to seek out evidence helpful to the defense and defendant lacks a factual basis for his claim, defendant's argument that police failed to investigate lacks merit. The prosecutor erred by denigrating defense counsel in closing remarks, but because a curative instruction would have alleviated the error, reversal is not warranted. As for whether the prosecutor vouched for the witnesses in closing and rebuttal closing arguments, the prosecutor fairly commented on the evidence. The trial court did not err by declining to issue the addict-informer jury instruction as to Ordiway because it was unsupported by the facts, and for the same reason, counsel was not ineffective for failing to request the instruction as to Weekley. Defendant was not deprived of a fair trial warranting reversal for cumulative error. As for defendant's sentence, error only as to OV 4 does not warrant resentencing, and defendant failed to rebut the presumption that his within-guidelines sentence was proportionate.

We therefore affirm.

/s/ Matthew S. Ackerman
/s/ Adrienne N. Young
/s/ Daniel S. Korobkin